CHUGACH NATIVES, INC., Sealaska Corp., the Aleut Corp., Koniag, Inc. and Ahtna, Inc., Plaintiffs-Appellees,

v.

DOYON, LTD., Defendant-Appellant,

and

Bristol Bay Native Corp., Inc., Arctic Slope Regional Corp., Bering Straits Native Corp., et al., Defendants.

The ALEUT CORP., Sealaska Corp., Koniag, Inc., Chugach Natives, Inc., Ahtna, Inc., Plaintiffs-Appellees,

v.

BERING STRAITS NATIVE CORP., Defendant-Appellant,

and

Arctic Slope Regional Corp., Bristol Bay Native Corp., Inc., Cook Inlet Native Inc., Doyon, Ltd., and Nana Regional Corp., Inc., Defendants.

Nos. 77–1963, 77–2751.

United States Court of Appeals, Ninth Circuit.

Dec. 26, 1978.

As Amended Jan. 23, 1979.

724

Arthur Lazarus, Jr., Washington, D. C., and Allen McGrath, Anchorage, Alaska, Francis J. O'Toole (argued), Washington, D. C., and Edward G. Burton (argued), Anchorage, Alaska, for defendants-appellants.

James Atwood, Edward Weinberg, Washington, D. C., Michael M. Holmes (argued), Juneau, Alaska, for plaintiffs-appellees.

Nancy Firestone, Edward Shawaker, U. S. Dept. of Justice, and Sanford Sagalkin, Acting Asst. Atty. Gen., Washington, D. C., on brief as amicus curiae.

Before WRIGHT, GOODWIN and ANDERSON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

The single issue is whether sand and gravel are part of the surface or subsurface estate under the Alaska Native Claims Settlement Act, 43 U.S.C.A. §§ 1601, et seq. (West Supp.1978) (ANCSA or Claims Act). The district court decided this question by partial summary judgment and properly certified the order for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (1976). Having granted leave to appeal, we affirm in part and reverse in part and hold that, under ANCSA, sand and gravel are part of the subsurface estate.

## I.

### FACTS

#### A. THE CLAIMS ACT.

The purpose of the Claims Act is to settle equitably the aboriginal claims made by Alaska Natives through a combination grant of land and money. Twelve Regional and 220 Village Corporations have been organized to represent Natives in geographic areas and to manage the property and funds received from the federal government.[1]

Sections 12 and 14 of the Claims Act, 43 U.S.C.A. §§ 1611, 1613 (West Supp.1978),[2] patent to the Village Corporations the surface estate in a total of 22 million acres, with the subsurface estate patented to the Regional Corporations.[3] The Regional Corporations also receive both the surface and subsurface estates in an additional 16 million acres.[4]

Section 7(i) of ANCSA, 43 U.S.C.A. § 1606(i) (West Supp.1978),[5] provides that 70% of all revenues received by each Regional Corporation from timber and subsurface estate resources must be divided among all 12 Regional Corporations in proportion to the number of Natives enrolled in each region. At least 50% of the revenues so received must be redistributed among the Village Corporations. ANCSA § 7(j).

1. Rights of a thirteenth Regional Corporation, organized to represent non-resident Natives of Alaska, are not involved in this action.

2. Future citation to 43 U.S.C.A. §§ 1611, 1613 (West Supp.1978) will refer only to ANCSA §§ 12 and 14 respectively.

3. ANCSA §§ 12(a) and 14(f) provide that, when Village Corporations select their surface estates from lands within the National Wildlife Refuges or the National Petroleum Reserve, the subsurface estate is reserved to the federal government. In such cases, the Regional Corporations affected may select "in lieu" subsurface estates from federal lands specifically withdrawn for this purpose.

4. The Secretary of the Interior is also authorized under § 14(h) to withdraw two million acres for other purposes, making the total land grant to Native groups 40 million acres.

5. Future citation to 43 U.S.C.A. § 1606 (West Supp.1978) will refer only to ANCSA § 7.

## B. BACKGROUND OF THIS LITIGATION.

This action was brought originally by Aleut Regional Corporation against the Arctic Slope Regional Corporation on April 4, 1975. Following numerous cross-motions, all Regional Corporations were joined.[6] Plaintiffs seek a declaration of their rights and obligations under ANCSA § 7(i) and an accounting of timber and subsurface resource revenues received by defendants. Many of the issues below regarding the meaning and application of the revenue sharing formula under ANCSA § 7(i) either have been determined by the district court by interlocutory order or continue to be litigated. See *Aleut Corp. v. Arctic Slope Regional Corp.*, 410 F.Supp. 1196, 417 F.Supp. 900, 421 F.Supp. 862, 424 F.Supp. 397 (D.Alaska 1976).

The question here is whether sand and gravel are part of the surface or subsurface estate. The district court held that, in those lands in which the fee is divided between Regional and Village Corporations, sand and gravel are part of the surface estate belonging to the Village Corporations. In lands held entirely by the Regional Corporations, however, the district court concluded that sand and gravel are part of the subsurface estate and subject to § 7(i)

revenue sharing. After proper certification by the district court under 28 U.S.C. § 1292(b) (1976), this appeal followed.[7]

## II.

## THE DISTRICT COURT HOLDING

The district court reached what it conceded to be a "somewhat anomalous" result in construing ANCSA § 7(i). It interpreted the term "subsurface estate" to have one meaning when a Village Corporation holds the surface estate and exactly the opposite meaning when the surface estate is owned by a Regional Corporation.

■ An accepted rule of statutory construction is that the same words or phrases are presumed to have the same meaning when used in different parts of a statute. *United States v. Gertz*, 249 F.2d 662, 665 (9th Cir. 1957); *Sampsell v. Straub*, 194 F.2d 228, 230 (9th Cir. 1951), cert. denied, 343 U.S. 927, 72 S.Ct. 761, 96 L.Ed. 1338 (1952).

This presumption may be rebutted if the same words or phrases are used "in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent." *Helvering v. Stockholms Enskilda*

---

**6.** Plaintiffs below are Ahtna, Inc.; Aleut Corp.; Chugach Natives, Inc.; Koniag, Inc.; and Sealaska Corp. Other Regional Corporations that did not join as plaintiffs were named as defendants. In addition to Arctic Slope Regional Corp., defendants below are Bering Straits Native Corp.; Bristol Bay Native Corp., Inc.; Calista Corp.; Cook Inlet Region, Inc.; Doyon, Ltd.; and Nana Regional Corp., Inc.

**7.** Six Regional Corporations filed separate notices of appeal. All but those appeals filed by Doyon and Bering Straits were dismissed. The parties are not aligned as appellants and appellees, nor as plaintiffs and defendants below, in relation to their respective positions on the issue appealed here.

Only some of the parties filed briefs. Appellant Doyon, appellees Bristol Bay and Cook Inlet, and Eklutna (a Village Corporation) as amicus curiae all urge that sand and gravel are part of the surface estate regardless of who owns the surface or subsurface estates. Appellees Sealaska and Koniag, and the United States as amicus curiae, maintain that sand

and gravel are always part of the subsurface estate. Appellee Nana filed a short brief stating that "on balance, [Nana] holds with those who assert sand and gravel are part of the subsurface estate." The other Regional Corporations did not file briefs in this appeal, although Bering Straits indicated by letter to the clerk of the court that its position is the same as that of appellant Doyon.

Technically, the only issue on appeal here is whether the district court erred in holding that sand and gravel are part of the subsurface estate in lands entirely owned by the Regional Corporations. Our decision on this issue, however, necessarily affects the disposition of sand and gravel on dually owned lands, since, as we discuss below, the term "subsurface estate" under ANCSA must have the same meaning regardless of who owns the surface estate. Thus, we exercise our discretion to review the reasoning and holdings of the district court with respect to dually owned, as well as wholly owned, lands. See *Langnes v. Green*, 282 U.S. 531, 535–39, 51 S.Ct. 243, 75 L.Ed. 520 (1931).

*Bank,* 293 U.S. 84, 87, 55 S.Ct. 50, 51, 79 L.Ed. 211 (1934). *See also Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).[8]

Application of *Helvering v. Stockholms Enskilda Bank* and *Atlantic Cleaners* here does not overcome the general presumption. Those cases provide only that the presumption may be rebutted if the same words or phrases are used in *different* parts of the statute with manifestly different intent. The district court did not find that "subsurface estate" has different meanings when used in ANCSA §§ 7(i), 12, and 14. It concluded that the term, used only once in the *same* section, ANCSA § 7(i), has opposite meanings depending upon whether a Village or Regional Corporation holds title to the surface estate.

No party argued for this result below. All maintain that, following proper principles of statutory construction, the interpretation of "subsurface estate" must be the same regardless of who owns the surface estate. We agree. We therefore must determine if sand and gravel are part of the surface or subsurface estate for all purposes under the Claims Act.

## III.

### CONGRESSIONAL INTENT

█ Congress did not define "subsurface estate" in the Claims Act. Thus it is necessary to reconstruct what Congress intended to be included in the term.

### A.  LEGISLATIVE HISTORY OF ANCSA.

The term "subsurface estate" did not appear in the original drafts of the Claims Act.[9] H.R. 7039 provided that the Regional Corporations should receive patents to "all minerals covered by the mining and mineral

leasing laws." Alaska Native Land Claims: Hearings on H.R. 3100, H.R. 7039, and H.R. 7432 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs, 92d Cong., 1st Sess. 36 (1971), (House Hearings). H.R. 7432, S. 835, and S. 35 contained similar language.[10]

Soon after the final hearings on the House bills concluded, counsel for the Alaska Natives submitted certain amendments to their bill, H.R. 7039. One of these, suggesting the adoption of the "surface/subsurface" language, was intended "To Clarify Intent That the Regional Corporations Receive Title to the Entire Subsurface Estate, Including All Mineral Interests." House Hearings at 377. Apparently accepting the suggestion of counsel, the House subcommittee drafted a clean bill, melding many of the provisions of H.R. 3100 and H.R. 7039, and included the "surface/subsurface" language. This bill, designated H.R. 10367, was modified only slightly by the full committee and passed by the House.

The next day the Senate passed S. 35, which still described the Regional Corporations' land grant in terms of "Minerals . . . covered by the Federal mineral leasing laws." S.Rep.No. 92–405, 92d Cong., 1st Sess. 33 (1971). Later, the Senate considered H.R. 10367, struck all after the enacting clause, substituted the provisions of S. 35, and passed it.

The differing House and Senate versions of H.R. 10367 went to a conference committee which adopted the "surface/subsurface" language in the final draft of the bill that became the Claims Act.

#### 1.  *Significance of the Language Change.*

The parties differ on the significance they assign to this language change. Those

---

8.  Although the district court did not cite these two cases in its opinion, it apparently relied upon them in construing "subsurface estate." It referred the parties to them in certifying this question for interlocutory appeal.

9.  Precursors to the final bill passed as ANCSA included three bills introduced in the House and two in the Senate: H.R. 7039 (Alaska Natives' bill); H.R. 3100 (House Indian Affairs

Subcommittee (Aspinall) bill); H.R. 7432 (Administration bill); S. 835 (Alaska Natives' bill); and S. 35 (Senate Interior Committee (Jackson) bill).

10.  H.R. 3100 did not then provide for severance and separate ownership of the surface and subsurface (or mineral) estates. It thus did not contain similar provisions.

corporations arguing that sand and gravel are part of the surface estate (Surface Proponents) assert that the change was a mere "technical amendment" to the original language without substantive importance. The other corporations (Subsurface Proponents) maintain that the change demonstrated congressional intent to include sand and gravel as subsurface resources.

### a. Surface Proponents.

Doyon asserts that the legislative history establishes that Congress intended "subsurface estate" to be coextensive with "mineral estate." [11] Since neither term is defined in the Claims Act, Doyon urges that the common law definition of mineral estate should govern. See 2A C. Sands, Sutherland Statutory Construction § 50.01 (4th ed. 1973). The case law of the various states cited by Doyon generally holds that sand and gravel are not part of the mineral estate.[12]

After reviewing the cited cases and their underlying rationales for holding that sand and gravel are part of the surface estate, we agree with the district court that "the main identifying feature of these cases as well as those to the contrary is that they turn on their own peculiar facts and circumstances rather than on any controlling legal principles." 421 F.Supp. at 865.[13]

### b. Subsurface Proponents.

Koniag does not dispute that "subsurface estate" includes "mineral estate," but it maintains that the common law is not helpful in defining either term. It urges us to look instead to federal public land and mineral development law in defining subsurface estate.

Koniag admits that, had the Claims Act retained the originally proposed language granting the Regional Corporations "all minerals covered by the mining and mineral leasing laws," sand and gravel would have been part of the surface estate. See 30

---

**11.** The legislative history does indeed support Doyon's argument. The S. 35 version of § 7(i) explicitly used the term "minerals" instead of subsurface estate. In the report on H.R. 10367, the House Committee seemingly equated "subsurface estate" with "mineral estate." H.R.No. 92–523, 92nd Cong., 1st Sess. 6, *reprinted in* [1971] U.S.Code Cong. & Admin.News, pp. 2192, 2196. Further, § 14(g) of the Claims Act itself seems to equate "subsurface estate" with "mineral estate" by distinguishing between "land" and "minerals" and "surface" and "minerals."

**12.** *E. g., Harper v. Talladega County,* 279 Ala. 365, 185 So.2d 388 (1966); *Kinder v. LaSalle County Carbon Coal Co.,* 310 Ill. 126, 141 N.E. 537 (1923); *Builders Supplies Co. of Goldsboro, North Carolina, Inc. v. Gainey,* 14 N.C.App. 678, 189 S.E.2d 657 (1972); *Whittle v. Wolff,* 249 Or. 217, 437 P.2d 114 (1968); *Heinatz v. Allen,* 147 Tex. 512, 217 S.W.2d 994 (1949). Although there is no federal substantive common law, reference to the common law of the various states at the time a federal statute was enacted may be helpful in construing the statute. 2A C. Sands, Sutherland Statutory Construction § 50.04 (4th ed. 1973).

**13.** The holding in *Whittle v. Wolff,* 249 Or. 217, 437 P.2d 114 (1968), cited by Doyon and extensively discussed by Eklutna, does not persuade us to the contrary. *Whittle* involved the Klamath Termination Act, 25 U.S.C. § 564, *et seq.* (1976), which was enacted to terminate federal

supervision over the trust and restricted property of the Klamath Tribe of Indians.

At the request of the Indian owner, the United States sold an allotment of land. As required at the time by the Termination Act, 25 U.S.C. § 564g[b], the conveyance reserved the "subsurface rights" to be held in trust for a designated period. The grantee removed sand and gravel and the trustee for the Indian sued for damages.

The Oregon Supreme Court, reversing the trial court, held that sand and gravel were not part of the "subsurface rights." The court concluded that

[i]f we were to hold in this case that the right to extract sand and gravel was reserved to the grantor, we would have to assume that those who purchase land subject to a mineral reservation do so in contemplation of the possible destruction of their interest in the event that gravel lies under the surface of the land conveyed. We do not believe that parties to land transactions in this state normally have this understanding of the effect of a mineral reservation. 437 P.2d at 117–118.

The dissent pointed out, we believe correctly, that the conveyance of public land by a deed from the United States requires a different analysis than would be the case with private parties contracting for the conveyance of private land in which the seller reserves the subsurface or mineral estate.

U.S.C. §§ 601, 611 (1976) (1955 Act).[14] It maintains, however, that the 1955 Act did not alter the *nature* of sand and gravel as minerals, but rather only excluded them as *valuable* minerals for the purpose of locating a claim under the mining and mineral leasing laws.[15] Thus, the change in the final draft of the Claims Act, made to emphasize that the Regional Corporations received "the entire subsurface estate, including all mineral interests," was intended to cover *all* minerals, including "common varieties" such as sand and gravel, under the federal mineral disposal laws. 30 U.S.C. § 601 (1976).[16]

For purposes of this analysis, we may assume that "subsurface estate" is, as Doyon asserts, coextensive with "mineral estate." As the district court noted, "[t]his position is not in contradiction with the position that subsurface estate is a broader concept than minerals covered under the Federal mineral leasing laws as the latter concept is certainly more restrictive than the general concept of minerals." 421 F.Supp. at 865.

Although we conclude that the cases excluding sand and gravel from the mineral estate are factually distinguishable from the question on appeal, we are also unpersuaded that all "common varieties" under 30 U.S.C. § 601 (1976) are minerals included in the subsurface estate under the Claims Act.

Whether the 1955 Act is authority that sand and gravel are part of the subsurface estate is questionable. Its purpose was to amend the Materials Act of July 31, 1947, 61 Stat. 681, and the mining laws "to permit more efficient management and administration of the surface resources of the

---

**14.** The basic mining law for minerals not comprehended under the Federal Mineral Leasing Act of 1920, 30 U.S.C. § 181, *et seq.* (1976) is the mining law of 1872, 30 U.S.C. § 22, *et seq.* (1976). 30 U.S.C. § 22 (1976) makes available "all valuable mineral deposits in lands belonging to the United States . . . [for] occupation and purchase, by citizens of the United States." In *Layman v. Ellis,* 52 L.D. 714 (1929), the Interior Department held that gravel which could be extracted, removed, and marketed at a profit was locatable under the mining law.

In 1955, Congress amended 30 U.S.C. §§ 601–04 and enacted 30 U.S.C. §§ 611–15 dealing, *inter alia,* with sand and gravel. Section 611 provides that "[n]o deposit of common varieties of sand, stone, [or] gravel . . . shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States." Thus, Koniag admits, sand and gravel would not have been included in a grant of "all minerals covered by the mining and mineral leasing laws."

**15.** Sealaska also makes this argument. In support of their contention, the Corporations quote 30 U.S.C. § 601 (1976), which refers to sand and gravel as "mineral materials," and cite two noteworthy cases.

In *United States v. U. S. Minerals Development Corp.,* 75 I.D. 127 (1968), the Interior Department concluded that, despite 30 U.S.C. § 611, some kinds of building stone are still locatable under the mining laws. The Department referred to "common varieties" as well as "uncommon varieties" as minerals. This decision was expressly approved by this circuit in *McClarty v. Secretary of the Interior,* 408 F.2d 907 (9th Cir. 1968).

In *United States v. Isabel Construction Co.,* 78 I.D. 385 (1971), the Interior Department Board of Land Appeals determined what minerals were included in a reservation of "minerals" to the United States:

> In as much as valuable deposits of sand and gravel were, for many years, regarded as minerals subject to location under the General Mining Law of 1872, 30 U.S.C. § 22, *et seq.* (1970), and since the enactment of the Multiple Surface Resources Act did not affect the mineral character of these materials, we conclude that valuable deposits of common sand and gravel are minerals, and as such would ordinarily be reserved to the United States under a reservation of "minerals."

*Id.* at 390.

**16.** Sealaska seems to argue at one point that a grant of the subsurface estate is broader than one conveying the rights to all minerals. It interprets the legislative history that Regional Corporations received "the entire subsurface estate, *including all mineral interests*" (emphasis added), to mean that the subsurface estate is composed of more than mineral rights. It apparently argues that, even if sand and gravel are not minerals, they are meant to be included in the subsurface estate because the great bulk of these resources are under the "surface" of the land.

Sealaska offers no more than its conclusory interpretation of the quoted language to support its argument. We are not convinced that "subsurface estate" encompasses more than a grant of all mineral rights in the land.

public lands by providing for multiple use of the same tracts of such lands." H.R.No. 730, 84th Cong., 1st Sess. 2, *reprinted in* [1955] U.S.Code Cong. & Admin.News, p. 2474. In view of this purpose and other parts of the legislative history, it is possible that Congress intended both the "mineral materials" and "vegetative materials" listed in 30 U.S.C. § 601 (1976) to be considered part of the surface estate under the mineral disposal laws. Indeed, the title of the chapter under which the 1955 Act was codified is entitled "Surface Resources." [17]

Despite the inconclusiveness of this part of ANCSA's legislative history, other factors convince us that Congress intended sand and gravel to be part of the subsurface estate under the Claims Act.

## B. SUBSURFACE ESTATE RESERVED TO THE UNITED STATES.

Sections 12(a) and 14(f) of ANCSA allow Village Corporations to obtain the surface estate in lands within the National Wildlife Refuges or the National Petroleum Reserve. The subsurface estate in such lands is reserved to the United States. Affected Regional Corporations may select "in lieu" subsurface estates from federal lands withdrawn for this purpose.

### 1. *National Wildlife Refuges.*

The subsurface estate in National Wildlife Refuges is reserved to the United States to "prevent mineral development that would be incompatible with the Refuge System." H.R.Rep.No. 92–523, 92d Cong., 1st Sess. 10 *reprinted in* [1971] U.S.Code Cong. & Admin.News, pp. 2192, 2200. If sand and gravel are held to be part of the surface estate, the United States argues, Village Corporations that develop these resources will destroy the surface of refuge lands because sand and gravel can only be extracted by open pit mining.

The district court rejected this argument and concluded that ANCSA § 22(g), 43 U.S.C.A. § 1621(g) (West Supp.1978), which limits the development rights of a surface estate holder within a refuge, prohibits this possibility. [18]

Even assuming the district court is correct regarding the effect of ANCSA § 22(g), we think that an opinion letter of the Associate Solicitor of the Department of the Interior dated May 18, 1976, is evidence that sand and gravel are subsurface resources reserved to the United States in National Wildlife Reserves. Responding to a request from the Anchorage Regional Solicitor, the Associate Solicitor classified sand and gravel as part of the subsurface estate. The opinion letter states:

The term "subsurface estate" is not defined anywhere in ANCSA; however, the term is mentioned in the Act as is the term "minerals." After studying the Act and reviewing its legislative history we

---

**17.** It is unlikely for another reason that Congress intended to include wholesale the mineral materials listed in 30 U.S.C. § 601 (1976), as part of the subsurface estate under ANCSA § 7(i). The definition of mineral materials includes common varieties of "sand, stone, gravel, pumice, pumicite, cinders, and clay." Vegetative materials include "yucca, manzanita, mesquite, cactus, and timber or other forest products." It is apparent that the classifications were based upon generic definitions of mineral and vegetable materials appropriate for the 1955 Act. Under Koniag's reasoning, even clay would be a subsurface resource subject to excavation by the Regional Corporations. We do not think Congress intended such a result.

The fact that Congress probably did not intend to include *all* mineral materials listed in 30 U.S.C. § 601 (1976) as part of the subsurface estate under ANCSA, however, does not, stand-

ing alone, convince us that sand and gravel are surface resources here.

**18.** Section 22(g) provides in pertinent part:

Notwithstanding any other provision of this Act, every patent issued by the Secretary pursuant to this chapter—which covers lands lying within the boundaries of a National Wildlife Refuge on [the date of enactment of this chapter] shall contain a provision that such lands remain subject to the laws and regulations governing use and development of such Refuge. 43 U.S.C.A. § 1621(g) (West Supp.1978).

Regulations promulgated under this section provide that "[e]conomic use shall be authorized by appropriate permit only when the authorized activity on a wildlife refuge area will not be incompatible with the purposes for which the refuge was established." 50 C.F.R. § 29.1 (1977).

conclude that the subsurface estate includes all minerals and that sand and gravel are minerals and thus a part of the subsurface.

This interpretation by the agency charged with the administration of land grants under ANCSA is entitled to great weight. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

### 2. *National Petroleum Reserve.*

Congress also reserved to the United States the subsurface estate of lands selected by Village Corporations within the National Petroleum Reserve. Although there is little in this portion of ANCSA's legislative history to explain what Congress intended to reserve as part of the subsurface estate, the Conference Report on the Naval Petroleum Reserve Production Act of 1976, 42 U.S.C. §§ 6501 *et seq.* (1976) (Reserve Act), is instructive. The report states in pertinent part:

> Inasmuch as the Alaska Native Claims Settlement Act authorized native village corporations to select certain Federally owned land in Alaska, including the right to apply for surface rights within the Naval Petroleum Reserve until December 18, 1975, this legislation authorizes the Secretary to convey such surface interests if the selections were made on or before that date, but in no event does the legislation authorize the disposition of the subsurface mineral estate within the national petroleum reserve to any person or group, except for mineral materials (e. g., sand, gravel, and crushed stone, which for the purpose of this legislation are considered to be a part of the subsurface mineral estate) which the Secretary may permit to be used for maintenance or development of local services by native communities or for use in connection with activities associated with administration of the reserve under this Act.

H.R.Rep.No. 94–942, 94th Cong., 2d Sess. 20, *reprinted in* [1976] U.S.Code Cong. & Admin.News pp. 492, 522.

We realize, as did the district court, that the Reserve Act does not specifically include sand and gravel as part of the subsurface estate under ANCSA. Nevertheless, portions of both the Reserve Act and ANCSA deal with the preservation of the surface estate in the National Petroleum Reserve, and we find the clear expression of congressional intent for the Reserve Act, which classifies sand and gravel as part of the subsurface estate, enlightening on the likely intent of Congress with respect to these resources under the Claims Act.

### C. AMENDMENT TO THE CLAIMS ACT.

The Act of January 2, 1976, P.L. 94–204, 89 Stat. 1145 (1976 Amendments), amended several sections of ANCSA. Section 15 of this act conveyed the subsurface estate of certain lands to Koniag. A separate enactment was necessary because in lieu lands Koniag had selected had also been withdrawn by the Secretary of the Interior under ANCSA § 17(d)(2), 43 U.S.C.A. § 1616(d)(2) (West Supp.1978), for possible addition to the national park system as a national monument. Section 15 of the 1976 Amendments provides:

> The Secretary shall convey . . . to Koniag, Incorporated, . . . such of the subsurface estate, *other than title to or the right to remove gravel and common varieties of minerals and materials*, as is selected by said corporation . . . . (Emphasis added.)

The Subsurface Proponents argue that Congress must have intended to include sand and gravel as part of the subsurface estate under ANCSA, or else it would not have needed to specifically exclude these resources in the subsurface grant to Koniag under the amendments to ANCSA.

The district court rejected this argument, noting that "[i]t is the usual rule that subsequent legislation is tenuous as evidence of earlier intent." 421 F.Supp. at 866. *See United States v. United Mine Workers of America*, 330 U.S. 258, 281–82, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). It also reasoned that, "[w]hile the interpretation

adopted by [the Subsurface Proponents] is plausible an equally compelling argument is that Congress was aware that the sand and gravel issue had been raised in this case and desired to make it clear that subsurface did not include this material." 421 F.Supp. at 867.

█ We are aware of the difficulties sometimes present in using subsequent legislation to determine Congressional intent for the original enactment, and we agree that subsequent legislation is not conclusive in such a determination. But we do not agree with the district court's statement of the "usual rule."

Courts have held that subsequent legislation declaring the intent of a previous enactment is entitled to great weight. *E. g., NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). *See also* 2A C. Sands, Sutherland Statutory Construction § 49.11 (4th ed. 1973). Although the 1976 Amendments do not explicitly declare the original intent of Congress under ANCSA with respect to sand and gravel, we believe they demonstrate that Congress understood these resources to be part of the subsurface estate.

The legislative history of the 1976 Amendments is devoid of any reference to this case below. There is thus no indication that Congress, in response to this litigation, wished to make it clear that sand and gravel are not part of the subsurface estate. The district court's suggestion to the contrary is only supposition. We decline to read this intent into the legislative history.

The 1976 Amendments, while not conclusive, support our holding that sand and gravel are part of the subsurface estate.

## D. POLICY OF THE CLAIMS ACT.

The purpose and policy underlying the Claims Act is stated in ANCSA § 2, 43 U.S.C.A. § 1601 (West Supp.1978):

Congress finds and declares that—

(a) there is an immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims; [and]

(b) the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives . . . .

The land grant under ANCSA was a generous one, clearly intended to exceed the subsistence needs of Natives and to give them a significant economic stake in the future development of Alaska. As stated by the House Committee on Interior and Insular Affairs:

The acreage occupied by villages and needed for normal village expansion is less than 1,000,000 acres. While some of the remaining 39,000,000 acres may be selected by the Natives because of its subsistence use, most of it will be selected for its economic potential. H.R.Rep.No. 92–253, 92d Cong., 1st Sess. 5, *reprinted in* [1971] U.S.Code Cong. & Admin.News pp. 2192, 2195.

The Surface Proponents point to this language as evidence that Congress intended Village Corporations to be economically strong entities that would select lands not only for subsistence purposes but also for their economic value. Because the extraction of sand and gravel destroys the surface, the district court concluded that "[a]s to the land to which the dual ownership applied a grant to the subsurface owner of the sand and gravel would leave the surface owner with a worthless holding. . . . [It] would in effect leave the villages, who have selected most of their land for economic potential, with nothing." 421 F.Supp. at 866.

We do not dispute that Congress intended Village Corporations to have a degree of independence from the Regional Corporations in order to protect the social and economic interests peculiar to their members. Nor do we dispute that extraction of sand and gravel destroys the surface.

We are not persuaded, however, that such facts indicate the Village Corporations would be left with "nothing" if sand and gravel are included in the subsurface estate. Nor are we convinced that Congress intend-

ed to include sand and gravel in the surface estate in order to avoid giving the Village Corporations a "worthless holding."

We agree with the district court that the revenue sharing provision in § 7(i) "was intended to achieve a rough equality in assets among all the Natives. . . . [The section] insures that all of the Natives will benefit in roughly equal proportions from these assets." 421 F.Supp. at 867.

Congress did not grant the same amount of land to each Village or Regional Corporation. It realized also that the lands selected by the Corporations would vary greatly in their present and future economic value. In order to distribute more evenly among all Natives the benefits of these disparate land grants, Congress required that 70 percent of all revenues from the development of timber and subsurface resources be distributed among the Regional Corporations.

Sand and gravel are resources that are only valuable if located near developing centers. The high cost of transportation makes it unprofitable to ship them over great distances. Construing sand and gravel to be part of the surface estate would give those Corporations near large cities and developing areas a significant economic advantage over the others.

As the district court noted with respect to lands owned entirely by Regional Corporations, "[i]t is precisely this unequal distribution of resources that section 7(i) is intended to counter." 421 F.Supp. at 867. We believe this reasoning is equally compelling when a Village Corporation, instead of a Regional Corporation, owns the surface estate.

Our holding that sand and gravel are part of the subsurface estate will not leave the Village Corporations with "nothing." Certainly some surface lands of some Village Corporations will be affected, but the destruction of village lands predicted by Doyon and Eklutna is vastly exaggerated.[19]

Village Corporations whose lands are affected by the excavation of sand and gravel will also receive their share of the profits distributed under § 7(i), since 50% of the revenues received by the Regional Corporations under this section must be redistributed to the Village Corporations.

## IV.

## CONCLUSION

There is no readily ascertainable answer to the question here on appeal. Viewed as a whole, however, the legislative history, administrative interpretations, companion legislation, subsequent amendments, and overall policy of the Claims Act indicate that Congress intended sand and gravel to be part of the subsurface estate.

AFFIRMED IN PART AND REVERSED IN PART.

---

19. Eklutna correctly notes that the surface within village boundaries cannot be disturbed by Regional Corporations developing their subsurface rights without the approval of the village involved. ANCSA § 14(f) provides that

"the right to explore, develop, or remove minerals from the subsurface estate in the lands within the boundaries of any Native village shall be subject to the consent of the Village Corporation."