KONIAG, INC., Plaintiff–Appellee,

v.

KONCOR FOREST RESOURCE; Ouzinkie Native; Natives of Kodiak VXM, Inc.; HZB, Inc., Defendants–Appellants.

KONIAG, INC., Plaintiff–Appellant,

v.

KONCOR FOREST RESOURCE; Ouzinkie Native; Natives of Kodiak VXM, Inc.; HZB, Inc., Defendants–Appellees.

Nos. 93–36138, 93–36164.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 2, 1994.

Decided Nov. 4, 1994.

Jacquelyn R. Luke, Middleton, Timme & Luke, Anchorage, AK, for plaintiff-appellee-cross-appellant.

David P. Wolf, David N. Goulder, Copeland, Landye, Bennett & Wolf, Portland, OR, for defendants-appellants-cross-appellees.

Before: PREGERSON, CANBY, and BOOCHEVER, Circuit Judges.

CANBY, Circuit Judge:

In *Tyonek Native Corp. v. Cook Inlet Region, Inc.*, 853 F.2d 727 (9th Cir.1988), we held that rock, sand, and gravel are part of the subsurface estate in dually owned lands conveyed to native regional corporations under the Alaska Native Claims Settlement Act, and that village corporations that own the surface have no right to these materials for the purpose of commercial extraction and sale. We left open, however, the question whether a village corporation has any right to use rock, sand, and gravel on site, incidental to the enjoyment of its surface estate. That question is now before us. We conclude that when there is no other practical source for these materials, the subsurface owner on these dually owned lands may not unreasonably deny the surface owner access to rock, sand, and gravel necessary for surface development.

I

Congress enacted the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 *et seq.*, to settle, through grants of a combination of land and money, all "claims by Natives of Alaska." H.R.Rep. No. 92–523, 92d Cong., 1st Sess. 3, *reprinted in* 1971 U.S.C.C.A.N. 2193 (hereinafter H.R.Rep. 92–523). To administer this land and money, the state was divided into twelve geographic regions, and the Natives within each region became shareholders in a regional corporation organized under Alaska law. 43 U.S.C. § 1606. Additionally, each of approximately 200 Native villages was required to form a village corporation with its villagers as shareholders. 43 U.S.C. § 1607.

The United States patented to the village corporations the surface estate in approximately 22 million acres of land. 43 U.S.C. §§ 1611, 1613 (1978). The underlying subsurface estate was patented to the appropriate regional corporation. *Id.* Lands divided in this way are referred to as "dually owned lands." *Tyonek*, 853 F.2d at 728. The regional corporations also received both the surface and subsurface estate in an additional 16 million acres. 43 U.S.C. § 1611(c). These wholly owned lands are referred to as "fee lands." *Tyonek*, 853 F.2d at 728.

Koncor Forest Resource Management Company is a partnership whose general partners are the wholly owned subsidiaries of four Native village corporations. Two of Koncor's partners hold title to surface estates on Afognak Island, south of Anchorage, Alaska, and have assigned to Koncor their rights to the timber on that land, "and all rights necessary to harvest the timber."[1] Koniag is the regional corporation that holds title to the subsurface—including rock, sand, and gravel—underlying Koncor's timber. Since it began harvesting timber over ten years ago, Koncor has used Koniag's rock[2] for road building and other construction connected with its logging operations. Despite Koniag's repeated demands, Koncor consistently has refused to pay for the rock it uses.

In 1988, Koniag brought this action in federal district court, seeking an injunction ordering Koncor to stop using rock except on terms and conditions acceptable to Koniag, and seeking damages for the rock Koncor already had used. Koncor counterclaimed, seeking, inter alia, a declaration that it has a right to use Koniag's rock to the extent necessary to harvest its timber, without payment to Koniag. The district court denied both parties the primary relief they requested. Although it awarded Koniag damages for Koncor's past use of rock, it issued a permanent injunction authorizing Koncor to

---

1. Because Koncor thus stands in the shoes of a village corporation with respect to the issues presented in this case, for convenience we refer to Koncor throughout as though it itself were a village corporation.

2. For convenience, we shall use "rock" to refer to rock, sand, and gravel, collectively. Nothing in our decision turns on the differences among these substances.

use Koniag's rock at a price set by the court, provided Koniag does not have a competing use. It also authorized Koncor to use rock in "cut-and-fill" operations without payment.

Koncor appeals, arguing that it should be permitted to use Koniag's rock without payment. In the alternative, it argues that the district court's definition of "cut-and-fill" is too narrow. Koniag cross-appeals, arguing that Koncor should be enjoined from using rock without Koniag's consent.

## II

Koncor's position is simply stated. It maintains that Congress intended that it benefit economically from the land it received under ANCSA. It notes, however, that it is faced with a potential barrier to the realization of that goal. Its land is valuable principally as a source of timber, which cannot be harvested without using rock to build roads and other facilities. The only practical source of rock for those purposes is the subsurface estate owned by Koniag. Consequently, if Koniag has absolute control over the disposition of its rock, it can block Koncor's timber harvesting by setting an unreasonably high price, or by refusing to sell rock at all. Koncor contends that such control, with its potential for reducing the value of Koncor's land to zero, is inconsistent with Congress's intent that Koncor be able to develop its land. It argues, therefore, that when the United States simultaneously conveyed the surface estate to Koncor and the subsurface to Koniag, it must also have granted Koncor, by implication, the right to use rock from the subsurface to the extent necessary to harvest its timber, thus imposing a servitude on the subsurface estate. In short, Koncor contends that it has, in effect, an easement of necessity to use Koniag's rock. We agree to a point.

3. In *Superior Oil,* we considered an easement in the traditional sense of the term: the right of access over the land of another. The easement we consider here—the right to acquire a portion of the property of another through its severance from the servient estate—traditionally was termed a profit a prendre. *See Restatement of Property* § 450, Special Note. However, because

## III

In determining whether land patented from the United States is burdened by an implied servitude, we look to several factors, including congressional intent, the degree of necessity for the easement, whether consideration was given for the land, whether the claim is against the United States or against a simultaneous conveyee, and the terms of the patent itself. *See Superior Oil Co. v. United States,* 353 F.2d 34, 36–37 & n. 5 (9th Cir.1965).[3] Analysis of each of these factors indicates that Koniag's land is subject to a servitude whereby Koniag may not unreasonably deny Koncor access to rock.

### A. Congressional intent

Congress's intent in granting Koncor its land is an important factor in determining the existence and extent of Koncor's rights to use Koniag's land. *See Superior Oil,* 353 F.2d at 36 & n. 2; *cf. Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 53–56, 103 S.Ct. 2218, 2228–30, 76 L.Ed.2d 400 (1983) (congressional intent as to surface use paramount in determining extent of mineral reservation). ANCSA's legislative history makes clear that Congress contemplated that land granted under ANCSA would be put primarily to three uses—village expansion, subsistence, and capital for economic development. *See* H.R.Rep. 92–523 at 5, 1971 U.S.C.C.A.N. at 2195. Of these potential uses, Congress clearly expected economic development would be the most significant:

> The 40,000,000 acres is a generous grant by almost any standard. . . . The acreage occupied by the Villages and needed for normal village expansion is less than 1,000,000 acres. While some of the remaining 39,000,000 acres may be selected by the Natives because of its subsistence use, *most of it will be selected for its economic potential. . . . [T]here will be little incentive for the Natives to select*

the rules applying to easements and to profits are the same, *id.,* our analysis does not depend on the term used. Therefore, we use the term "easement" throughout, and freely draw on authority dealing both with easements and profits. *See generally* 3 Powell, *Powell on Real Property* § 34.01[1] (1994).

lands for subsistence use because during the foreseeable future the Natives will be able to continue their present subsistence uses regardless of whether the lands are in Federal or State ownership.

*Id.* (emphasis added). *See also Chugach Natives, Inc. v. Doyon, Ltd.,* 588 F.2d 723, 731 (9th Cir.1978). While the Act itself does not speak directly to this congressional expectation, it is reflected in ANCSA's requirement that Natives form corporations to receive and administer the land they receive. There would be little purpose in this requirement if Congress did not expect Natives to benefit from the economic development of their land.

■ Koniag contends, nonetheless, that because village corporations were required to select land near their villages, and because some villages are in areas where the surface has little economic potential, Congress could not have intended that all village corporations develop their land. We agree, but find the argument irrelevant. On the basis of the legislative history and the Act's requirement that Natives incorporate, we have no doubt that Congress intended, at least, that those Native corporations that did select land for its economic potential would be able to develop that land and to realize that potential.

■ Koncor carefully selected its land for the value of the timber on it. Accordingly, we conclude that Congress did not intend to grant Koncor land whose value could be reduced to zero by fiat of a subsurface owner that refused to sell it rock needed for development, or that charged an unreasonably high price for that rock. *See Hunter v. United States,* 388 F.2d 148, 153–54 (9th Cir.1967) (noting the "well-settled rule that the grant of a right in real property includes all incidentals possessed by the [grantor] and without which the property granted cannot be fully enjoyed.")

### B. Necessity

■ There is no dispute that Koncor has no other practical source of rock required for its timber harvesting, and that without reasonable access to Koniag's rock its land is economically worthless. This degree of necessity points strongly in favor of the easement Koncor claims. *See Restatement of*

*Property* § 476, comment g. ("If the necessity of an easement is such that without it the land cannot be effectively used, nothing less than explicit language in the conveyance negating the creation of the easement will prevent its implication.")

### C. Consideration

■ Although ANCSA land grants were not made as part of a direct sale, they must reasonably be viewed as having been supported by valuable consideration. The ANCSA grants were made to settle Native aboriginal claims to land in Alaska, and to compensate Alaska Natives for past takings of aboriginal title. *United States v. Atlantic Richfield Co.,* 435 F.Supp. 1009, 1020–21 (D.Alaska 1977), *aff'd,* 612 F.2d 1132 (9th Cir.1980), *cert. denied,* 449 U.S. 888, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). Construing Koncor's and Koniag's titles to their respective estates in a way that potentially renders worthless Koncor's estate would be inconsistent with Congress's compensatory goals.

### D. Simultaneous conveyance

■ Ordinarily, when the United States grants land, reserving certain rights to itself, doubts over the extent of the reservation are to be resolved in favor of the United States. *See Andrus v. Charlestone Stone Prods. Co.,* 436 U.S. 604, 617, 98 S.Ct. 2002, 2009–10, 56 L.Ed.2d 570 (1978). Here, however, the United States did not retain an interest in the land, but simultaneously conveyed both the surface and the subsurface to third parties. Therefore, we need not indulge in this normal presumption; Koniag does not stand in the shoes of the United States. Moreover, as a general rule, when an estate is split and simultaneously conveyed to two parties, the case for an implied easement is much stronger than when the grantor retains his interest. *See Restatement of Property* § 476, comment f. ("It is reasonable to infer that a conveyor who has divided his land among simultaneous conveyees intends that very considerable privileges of use shall exist between them.")

### E. Language of the patents

 Koniag notes that its patent to the subsurface underlying Koncor's estate contains certain restrictions. For example, Koniag's title to the subsurface is subject to valid rights existing at the time of the conveyance. 43 U.S.C. § 1613(g). Similarly, its right to develop any portion of its estate within the boundaries of a Native village is subject to the consent of the village corporation. 43 U.S.C. § 1613(f). Citing *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910–11, 64 L.Ed.2d 548 (1980), Koniag contends that because Congress enumerated these specific restrictions on its title, we should not read additional restrictions into its patent. *Glover*, however, stands only for the proposition that, "where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, *in the absence of evidence of contrary legislative intent.*" *Id.* (emphasis added). To the extent that this rule of construction is relevant in the present context, it presents no barrier to our conclusion; as discussed above, we find a clear congressional intent that Koncor benefit from development of its surface estate.

Koniag's citation to *United States v. Wood*, 466 F.2d 1385, 1387 (9th Cir.1972) is similarly unavailing. In *Wood* we stated that a patent from the United States conveys the entire interest possessed by the United States except that which is specifically reserved. *Id.* Koniag contends, therefore, that because there is no specific reservation of an easement in its patent, *Wood* prohibits us from finding one by implication. However, in *Wood*, we carefully qualified our statement of the general rule by noting the possibility of finding an easement by implication · or by estoppel. *Id.* at 1388 n. 3. We have found one.

### F. Conclusion

 Consideration of these factors, particularly Congress's intent that Native corporations benefit from the land they selected,

and the fact that Koncor has no other source of the rock needed to utilize its land, compels the conclusion that when the United States conveyed dually owned land to Koncor and Koniag, it conveyed to Koncor, as surface owner, a right not to be unreasonably denied access to subsurface, rock as long as there is no other practical source. Koniag's estate is burdened with a corresponding servitude.[4] The district court, therefore, properly denied Koniag's request for an injunction that would have given it absolute control over the disposition of its rock.

### IV

Our conclusion does not imply, however, that Koncor has a right to use Koniag's rock without payment.

Koncor proposes what it describes as the "dormant estate" theory in support of its contention that it has a right to use Koniag's rock without paying for it. According to Koncor, Koniag's subsurface estate is "dormant," because Koniag has no potential buyers for its rock. In this circumstance, Koncor argues, it ought to be able to use the rock free of charge because in doing so it will not be depriving Koniag of money it might otherwise receive for that rock.

The obvious flaw in this argument is that Koniag has a potential buyer for its rock: Koncor. When Koncor uses rock without paying for it, Koniag loses the money that Koncor otherwise would be paying, along with the opportunity to sell the rock at some time in the future, when there may be other buyers. The fact that Koniag presently lacks *other* potential buyers for its rock does not render the rock worthless. Koncor's position as the sole current potential purchaser for Koncor's rock is counterbalanced by Koniag's monopoly over rock on the island.

 A greater flaw in Koncor's position is that it conflicts with the purpose underlying one of ANCSA's most important provisions. ANCSA section 7(i) (43 U.S.C. § 1606(i)), requires regional corporations to

---

4. To ensure that Koncor receives the benefits that Congress intended from the settlement, it is clear that the right of reasonable access to rock is not personal to Koncor, but rather runs with the surface estate. For similar reasons, Koniag's burden is not personal, but runs with the subsurface estate.

redistribute to other regional corporations 70% of all income derived from their subsurface resources.[5] Congress imposed this requirement in recognition that Native corporations would not all receive land of equal value. *Chugach,* 588 F.2d at 732. The redistribution of revenue partially mitigates the disparity in the quality of land various corporations received, and therefore helps "achieve a rough equality in assets among all the Natives." *Id.*

We relied on section 7(i) in *Chugach* and *Tyonek,* where we determined that rock, sand, and gravel are part of the subsurface estate both on fee land (*Chugach*) and on dually owned land (*Tyonek*). We reasoned:

> Sand and gravel are resources that are only valuable if located near developing centers. The high cost of transportation makes it unprofitable to ship them over great distances. Construing sand and gravel to be part of the surface estate would give those Corporations near large cities and developing areas a significant economic advantage over the others.

*Chugach,* 588 F.2d at 732. Because "it is precisely this unequal distribution of resources that section 7(i) is intended to counter," we concluded that rock, sand, and gravel must be part of the subsurface estate. *Id.* (quoting *Aleut Corp. v. Arctic Slope Regional Corp.,* 421 F.Supp. 862, 867 (D.Alaska 1976)); *Tyonek,* 853 F.2d at 729.

■ The surface of Afognak Island, with Koncor's active timber harvesting, is the kind of developing region we referred to in *Chugach.* Allowing Koncor to use Koniag's rock without payment would allow Koncor, which is not required to share its revenues with other Native corporations, to capture the entire value of the rock it uses—rock which we determined in *Chugach* and *Tyonek* must be

subject to section 7(i)'s revenue sharing provisions.[6]

■ Accordingly, while Koniag may not unreasonably deny Koncor access to rock necessary for its timber harvesting operations, Koncor must pay a reasonable price for the rock it uses. This requirement ensures that, in the situation presented in this case, ANCSA's goals are not thwarted. That Koniag may not unreasonably deny Koncor access to its rock achieves ANCSA's purpose of allowing Koncor to benefit economically from its surface estate. That Koncor must pay for the rock it uses promotes ANCSA's equally important goal of ensuring that revenues derived from subsurface resources be shared among all Natives.

## V

The district court's injunction requires Koniag to sell Koncor rock at $0.30 per cubic yard, gravel at $0.30 per cubic yard, and sand at $0.75 per cubic yard. For the reasons set out below, we vacate the injunction.

■ Koncor's right of access to Koniag's rock is limited in two important respects. First, it is conditioned on there being no other practical source of rock for Koncor's needs. Second, it is not a right to free access; it is a right to reasonable access. Therefore, before Koncor can expect courts to intervene on its behalf, it must establish two things. First, it must demonstrate that Koniag owns the only practical source of material for development of its surface estate. It already has done this. Second, Koncor has the burden of showing that it has been unreasonably denied access to Koniag's rock. Unless Koncor can demonstrate that Koniag is unreasonably denying it access to

---

**5.** Section 7(j) then requires that each regional corporation distribute 50% of the funds thus received to the village corporations in its region.

**6.** Koncor argues the fact that, because section 7(i) does not require village corporations to share revenues, Congress must have intended that regional corporations are to receive no money, in any way, derived from the sale of resources owned by village corporations. It argues that requiring it to pay for rock it uses in timber harvesting is contrary to this intent, because such

payments reduce its net profits from the sale of timber.

There is no basis for the inference Koncor wants to draw. The fact that ANCSA does not impose a legal requirement that village corporations share revenues with regional corporations does not imply a congressional intent that the village corporations should be able to obtain from regional corporations, without payment, all resources necessary to develop their surface estates.

rock it needs for development, it suffers no injury, and therefore has no standing to seek the aid of the court. *See Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

■ The district court never addressed this second issue. Instead, it determined that $0.30 per cubic yard is a "fair price" for Koniag's rock. However, even if $0.30 per cubic yard is a fair price,[7] it does not follow that the price Koniag is demanding—currently $0.75 per cubic yard—is unreasonable. What counts as a reasonable price is not subject to precise mathematical definition. In any location, for any resource, there will be a range of prices, perhaps a wide range, none of which are unreasonable. On the record before us, we cannot conclude that the price Koniag is demanding clearly falls outside or inside that reasonable range.

Accordingly, we vacate the district court's injunction. If the parties do not settle on a mutually agreeable price, on remand Koncor has the burden of showing that the price[8] Koniag demands for rock is unreasonably high, or that Koniag is refusing to sell Koncor rock at any price. If Koncor carries this burden, the district court may issue an injunction requiring Koniag to sell Koncor rock, sand, and gravel at prices that the district court determines are reasonable.

■ If Koncor fails to carry its burden, then it either must pay the price Koniag demands, or stop using its rock. If it contin-ues to use the rock without paying a reasonable price, as it has in the past, the district court may, in its discretion, issue an injunction ordering Koncor to stop using Koniag's rock unless it pays the reasonable price Koniag demands.[9]

## VI

Cut-and-fill construction involves preparing land by leveling those portions that are above the desired grade, and using the material thus removed to fill in those portions that are below the desired grade. The district court's injunction provides that Koncor can use rock in cut-and-fill operations without payment, as long as it is used in the "same project" from which it was obtained. According to the injunction, " 'same project' refers to such things as camp sites, log sort yards, or log transfer sites, each considered separately." In the case of road construction, the injunction provides that Koncor need not pay for cut-and-fill material provided that it is moved no more than 500 feet for use in the same roadbed. Any material "blasted, hauled by truck, put through a crusher or obtained from a borrow pit or quarry" is not considered cut-and-fill.

Once again, both parties are unhappy with the terms of the injunction. Koniag contends that Koncor must pay for all rock it uses. Koncor contends that the "same project" and 500 foot limits placed on its use of

---

7. We express no view whether $0.30 per cubic yard in fact is a fair price. In light of our disposition, we need not reach this issue. We note, however, that even were we to attempt to address the issue, we would be forced to remand for additional findings. The district court arrived at the figure of $0.30 per cubic yard after hearing testimony from a variety of witnesses who gave estimates ranging from $0.00 to $0.75 per cubic yard. However, the district court's findings of fact and conclusions of law provide no indication how it arrived at the figure it finally concluded was fair. Indeed, from the little the district court did say, it appears that it merely picked a number close to halfway between the highest and lowest estimates it received. Such findings are inadequate. The district court must make findings that are sufficiently detailed to allow us to discover how and why it reached the price it did. *Cf. United States v. Merz,* 376 U.S. 192, 199, 84 S.Ct. 639, 643–44, 11 L.Ed.2d 629 (1964).

8. In the event the parties have difficulty in reaching such an agreement, the district court may in its discretion encourage the parties to use mediation or arbitration procedures. We believe it is to both parties' advantage to reach such agreements without the costs and delays of litigation.

9. In this circuit, the threat of irreparable injury is not a prerequisite for a permanent injunction. *Continental Airlines, Inc. v. Intra Brokers, Inc.,* 24 F.3d 1099, 1104 (9th Cir.1994). It is sufficient that a plaintiff show that it has no adequate legal remedy. *Id.* If Koncor continues to use Koniag's rock without paying a reasonable price, Koniag's only recourse, short of an injunction, is a multiplicity of damage suits. In this circumstance, a district court may conclude that Koniag has no adequate remedy at law. *See id.; See generally* 1 Dobbs, *Remedies* 750–52, 807–11 (2d ed. 1993).

cut-and-fill are too narrow. It insists that whenever it needs to cut down some surface, it ought to be able to use the material thus removed whenever and wherever it wishes, without payment.

 A district court has broad discretion in fashioning equitable relief. *S.E.C. v. United Fin. Group,* 474 F.2d 354, 358–59 (9th Cir.1973). We find no abuse of discretion in this instance. Koniag does not dispute that Koncor has a right to prepare sites by cutting down high spots or digging depressions when necessary. Nor does it contend that Koncor must necessarily pay for material it so removes. It contends, instead, that Koncor must pay for that material only if Koncor uses it as fill. Yet if Koncor may remove material without payment, it makes no legal or economic sense to compel Koncor to pay for that material merely because it happens to dispose of it in a manner beneficial to Koncor, rather than in a manner that is of no benefit to anyone. Koniag cites, and we can discover, no decision holding that a surface owner must compensate a subsurface owner for material thus moved. Therefore, we reject Koniag's position that Koncor must pay for any and all rock it moves in cut-and-fill construction.

This case, however, presents some unique concerns. In what we imagine is the ordinary case, cut-and-fill construction involves relocation of relatively valueless material, of no concern to the subsurface owner. Such is not the case here. Therefore, any ruling that Koncor may use all rock obtained by necessary cutting without compensating Koniag is open to potential abuse. For example, rather than cutting only when necessary, Koncor could maximize its use of cut-and-fill construction by choosing to route roads along the sides of hills rather than over flat land. Similarly, it could choose to site camps on land that requires a great deal of leveling and grading. There is evidence in the record that Koncor does precisely these things. Such tactical decisions, made not because they are topographically necessary, but in order to obtain as much rock as possible without paying for it, unfairly deprive Koniag of revenues from the sale of rock, and fall outside the range of what we consider legiti-mate incidental uses that do not require payment to Koniag.

The limitations the district court placed on the definition of cut-and-fill are intended to minimize the potential for such abuses, with a minimum of future judicial intervention. In creating those limitations, the district court did not abuse its discretion. Koncor appealed to the court's equitable powers, and the court, in our view, fashioned an equitable solution, protecting the rights of both parties. Accordingly, we affirm that portion of the district court's injunction concerned with cut-and-fill.

## CONCLUSION

Apart from Koniag's rock, there are no practical sources of rock for development of Koncor's surface estate, consistent with the intent of ANCSA. Therefore, Koncor, as surface owner, has a right not to be unreasonably denied use of rock from Koniag's subsurface estate. The benefits and burdens of this servitude run with the respective estates.

However, on the record before us, there is insufficient evidence to determine whether Koniag presently is violating Koncor's right to reasonable access. Accordingly, we vacate the district court's injunction except insofar as it applies to cut-and-fill operations, and remand to the district court for further proceedings not inconsistent with this opinion. Each party will bear its own costs on appeal.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**