The ALEUT CORPORATION et al., Plaintiffs,

v.

ARCTIC SLOPE REGIONAL CORPORATION et al., Defendants.

Civ. No. A75–53.

United States District Court, D. Alaska.

Oct. 13, 1976.

See also 417 F.Supp. 900.

Gary Thurlow, Croft, Thurlow & Loutrel, Anchorage, Alaska, Stephen M. Truitt, Wald, Harkrader & Ross, Washington, D. C., for the Aleut Corp.

Michael M. Holmes, Faulkner, Banfield, Doogan & Holmes, Donald Beighle, Juneau, Alaska, Richmond F. Allan, Weissbrodt & Weissbrodt, Washington, D. C., for Sealaska Corp.

Milton M. Souter, Kodiak, Alaska, Edward Weinberg, Jay R. Weill, Duncan, Brown, Weinberg & Palmer, Washington, D. C., for Koniag, Inc.

Joe P. Josephson, Anchorage, Alaska, Howard S. Trickey, Washington, D. C., for Chugach Natives, Inc.

Robert M. Goldberg, Anchorage, Alaska, for Ahtna, Inc.

Edward A. Merdes, Merdes, Schaible, Staley & DeLisio, Fairbanks, Alaska, Richard A. Derham and James Wickwire, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for Arctic Slope Regional Corp.

Sheila Gallgher, Anchorage, Alaska, for Bering Straits Native Corp.

James Vollintine, Anchorage, Alaska, for Bristol Bay Native Corp., Inc.

William K. Jermain, Hal R. Horton, Birch, Jermain, Horton & Bittner, Anchorage, Alaska, for Calista Corp.

Allen McGrath, John R. Snodgras, Graham & James, Anchorage, Alaska, for Cook Inlet Region, Inc.

William H. Timme, Fairbanks, Alaska, Francis J. O'Toole, Arthur Lazarus, Jr., Fried, Frank, Harris, Shriver & Kempelman, Washington, D. C., for Doyon, Ltd.

Joseph Rudd, Ely, Guess & Rudd, Anchorage, Alaska, Richard A. Baenen, Washington, D. C., for NANA Regional Corp.

VON DER HEYDT, Chief Judge.

## MEMORANDUM AND ORDER

THIS CAUSE comes before the Court on motions for partial summary judgment. Since the Court has previously set forth

much of the background information involved in *Aleut Corporation v. Arctic Slope Regional Corporation,* 410 F.Supp. 1196 (D.Alaska 1976), those matters will not be reiterated here. For present purposes it is sufficient to state that the Court is concerned with Section 7(i) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1606(i) (Supp. IV, 1974)[1] (hereinafter ANCSA or Act). These motions present two issues. They are:

1. Should sand and gravel be treated as a surface resource or a subsurface resource subject to revenue sharing under Section 7(i)?

2. Does the term "all revenues," as used in Section 7(i), mean gross revenues?

*Sand and Gravel.*

Section 7(i) provides in relevant part that "Seventy per centum of all revenues received by each Regional Corporation from the timber resources and subsurface estate . . . shall be divided annually . . . ." Therefore, if sand and gravel are treated as part of the subsurface estate the revenues received by each Regional Corporation from sand and gravel will be subject to the revenue sharing provisions of section 7(i).

The issue of whether sand and gravel are part of the surface or subsurface estate is also vitally important under Section 14 of the Act, 43 U.S.C. § 1613. That section involves the conveyance of lands to Village Corporations and Regional Corporations. Under the scheme provided in Section 14, the Secretary of the Interior is to issue a patent to the surface estate in certain lands to the Village Corporation [section 14(a) & (b), 43 U.S.C. § 1613(a) & (b)], and issue a patent to the underlying subsurface estate to the Regional Corporation [Section 14(f), 43 U.S.C. § 1613(f)]. Therefore, the determination of whether sand and gravel are part of the surface or subsurface estate will decide whether the Village or Regional Cor-

poration receives the patent to those materials. If the patent to sand and gravel goes to the Regional Corporation, revenues received by the Corporation will be subject to the revenue sharing provisions of 7(i). Unfortunately neither the case law nor the legislative history is particularly enlightening on this matter.

In adopting the phrases "subsurface estate" and "surface estate" in the final version of the Act, Congress altered the wording of some of the earlier drafts. In hearings before the Committee on Interior and Insular Affairs of the House of Representatives, Ninety-second Congress, First Session (House Committee) in May 1971 three bills, H.R. 3100, H.R. 7039 and H.R. 7432 were discussed. House Report 92–10. H.R. 7039 contained a section similar to section 14 of the final Act, but instead of patenting the surface estate to the Village Corporation and the subsurface estate to the Regional Corporation the bill provided that the Regional Corporation would receive ". . . all minerals covered by mining and mineral leasing laws . . . ." House Committee Report, p. 35–36. Subsequently the Committee received a request from counsel for the Alaska Federation of Natives to change this language to the surface/subsurface dichotomy in order "To Clarify Intent That the Regional Corporations Receive Title to the Entire Subsurface Estate Including All Mineral Interests." House Committee Report, p. 377.

The pertinent provisions of one of the principal Senate bills at that time patented to its counterpart of the Regional Corporation on these divided lands ". . . all minerals in such village lands covered by the Federal mineral leasing laws . . ." S. 35, April 1, 1971, § 15(c).

Had these bills maintained the distinction between minerals covered by the Federal mineral leasing laws the sand and gravel issue would have been quite clear. At that time (1971) the Federal mineral leasing

---

1. There were several amendments to the Act in January of 1976, *see* Pub.L. 94–204, Jan. 2, 1976, 89 Stat. 1145, 43 U.S.C. § 1604, et seq. (Supp. I, 1976). Section 15 of these amend-

ments has a relationship to one of the issues presently before the Court and will be dealt with in the course of this opinion.

laws did not include sand and gravel as a valuable material. *See* 30 U.S.C. § 611. The Village Corporations, therefore, would have received sand and gravel in the cases where the land was divided and these sand and gravel revenues would not have been distributed under the revenue sharing plans of those bills.[2] *See* S. 35, Sec. 9(d)(1), Senate Committee Report, H.B. 7039, Sec. 9(g)(2), House Committee Report, p. 29.

Following these hearings the House bills were combined and changed to include inter alia, the surface/subsurface dichotomy. The revised version was introduced on August 4, 1971,. as H.R. 10367. U.S.Code Cong. and Admin.News, 92nd Cong., First Sess., p. 2192–2193. *See* Sec. 11(h). This is the version of the Act which passed the House on October 20, 1971.

The Senate Committee reported out S. 35 with the original language relating to the Federal mining law and in acting upon H.R. 10367 replaced the surface/subsurface concept with that language. The Senate passed this altered version of the bill and it then went to a Conference Committee. That Committee reached agreement and the surface/subsurface language of H.R. 10367 was incorporated into the Act.

Counsel for the Corporations, urging that sand and gravel are part of the subsurface estate, maintain that the language change is crucial. It is their position that by changing from the concept of minerals covered under the Federal mineral leasing laws to subsurface estate that Congress intended to patent an estate that was more inclusive than the earlier bills. This position seems sound but the inquiry does not end here. The fact that subsurface estate is a broader concept does not indicate whether sand and gravel are included in that estate in this particular case.

Those Corporations which urge the Court to conclude that subsurface estate does not include sand and gravel maintain that sub-surface estate and mineral estate are coextensive. Their position is based on portions of the statutory language and legislative history which seem to use these terms interchangeably. *See* e. g. Sec. 14(g), 43 U.S.C. § 1613(g) which refers to "surface" and "minerals". These Corporations then maintain that case law stands for the proposition that sand and gravel are not minerals.

The portion of this reasoning which concludes that mineral estate and subsurface estate are coextensive may be sound. This position is not in contradiction with the position that subsurface estate is a broader concept than minerals covered under the Federal mineral leasing laws as the latter concept is certainly more restrictive than the general concept of minerals. The step from the conclusion that subsurface and minerals are equivalent to the conclusion that sand and gravel are not minerals is not so easily taken.

It is true that many cases hold that sand and gravel are not minerals. *See generally,* Annot: "Minerals"—Clay, Sand, or Gravel. 95 A.L.R.2d 843, 865 (1964). However, except for the cases which hold that sand and gravel are not locatable under Federal mineral leasing laws, see e. g. *Melluzzo v. Morton,* 534 F.2d 860 (9th Cir. 1976), the main identifying feature of these cases as well as those to the contrary is that they turn on their own peculiar facts and circumstances rather than on any controlling legal principles. Since the Court has determined that subsurface estate is more extensive than minerals locatable under Federal mineral leasing laws it becomes necessary to look at the peculiar circumstances of this case.

Obviously the most influential factor in this determination is the intent of the parties. Due to the nature of the conveyance here involved this intent only can be gleaned from the overall structure of the Act. In section 14 of the Act the Regional Corporations are given the subsurface es-

2. Counsel for Sealaska points out that 30 U.S.C. § 611 only determines what minerals are locatable under Federal mining law. *See Melluzzo v. Morton,* 534 F.2d 860 (9th Cir. 1976). Counsel makes this point with reference to another argument, however, and concurs in this construction of the earlier bills. Sealaska brief at 16. It is noteworthy that S. 36 § 9(d)(1) specifically referred to "leaseable mineral estate."

tate and the Village Corporations are given the surface estate to certain lands. The amount of land to which this particular dual ownership applies is far in excess of that which the Village Corporations need for their general subsistence. Congress was well aware of this fact and the legislative history states:

> The 40,000,000 acres (to be patented under the Act) is a generous grant by almost any standard. . . . The acreage occupied by Villages and needed for normal village expansion is less than 1,000,000 acres. While some of the remaining 39,000,000 acres may be selected by the Natives because of its subsistence use, most of it will be selected for its economic potential.

H.R.Rept. No. 92–523, quoted in U.S.Code Cong. and Admin.News, 92nd Cong., 1st Sess. p. 2195 (1971.)[3]

As to the land to which the dual ownership applied a grant to the subsurface owner of the sand and gravel would leave the surface owner with a worthless holding. It is common knowledge that sand and gravel only can be extracted through open pit mining which totally destroys the surface. To construe the subsurface owner as the sand and gravel owner would in effect leave the villages, who have selected most of their land for economic potential, with nothing.[4] This has been the rationale upon which many of the cases construing whether sand and gravel are minerals have turned and this rationale seems appropriate here.[5] See Kinder v. LaSalle County Carbon Coal Co.,

310 Ill. 126, 141 N.E. 537 (1923); Holloway Gravel Co. v. McKowen, 200 La. 917, 9 So.2d 228 (1942); Harper v. Talladega County, 279 Ala. 365, 185 So.2d 388 (1966); Bambauer v. Menjoulet, 214 Cal.App.2d 871, 29 Cal.Rptr. 874 (1963); Heinatz v. Allen, 147 Tex. 512, 217 S.W.2d 994 (1949); Acker v. Guinn, Tex., 464 S.W.2d 348 (1971). It appears implausible that Congress would have intended to oust the Village Corporations of beneficial ownership without a clearer expression of intent. Upon this policy consideration, therefore, the Court has determined that in the case of lands over which Congress has created dual ownership based on surface and subsurface estate, that sand and gravel are part of the surface estate and are not subject to revenue sharing under Section 7(i), 43 U.S.C. § 1606(i).

The Court does not find it necessary to reach a contrary result based upon subsequent legislation. Certain amendments to the ANCSA were adopted in 1976 which conveyed to Koniag, Incorporated ". . . such subsurface estate, other than sand and gravel . . . ." Pub.L. 94–204, Sec. 15, Jan. 2, 1976, 89 Stat. 1154. Proponents of the position that subsurface includes sand and gravel point to this language and state that Congress must have meant to include sand and gravel in the subsurface estate or it would not have felt the need to exclude it specifically in this section.

It is the usual rule that subsequent legislation is tenuous as evidence of earlier intent. U. S. v. Mine Workers, 330 U.S. 258, 281–82, 67 S.Ct. 677, 91 L.Ed. 884

---

3. Counsel for Sealaska would have the Court construe this language as giving a preeminent position to the Regional Corporation. In view of the fact that the Report used the word "Natives" rather than Regional Corporations this contention is not well taken. Nor can the Court accept the other arguments advanced which supposedly made the intent clear that the Regional Corporations were to be the only economically strong entitles.

4. The land upon which the actual village is located is not involved and the specter of a Regional Corporation digging in the center of a village is precluded by Sec. 14(f), 43 U.S.C. § 1613(f), which would require approval of the Village Corporation in this area.

5. Other reasons have been that sand and gravel are located on the surface and are not generally distinguishable from surrounding materials. See annot: 95 A.L.R.2d 843 (1964). The former rationale certainly is not always true and the latter is of little aid in construing "subsurface" rather than "minerals."

It is worthy of note that this rationale would not apply to coal. For although coal mining would also destroy the surface estate it is quite clear from the legislative history and statutory language that coal would belong to the subsurface estate. There is no need in the case of coal therefore to look so thoroughly into other considerations.

(1947); *U. S. v. Philadelphia Nat. Bank,* 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). This rule is bolstered in this case by the inherent ambiguity in this legislation. While the interpretation adopted by the one side is plausible an equally compelling argument is that Congress was aware that the sand and gravel issue had been raised in this case and desired to make it clear that subsurface did not include this material. This subsequent legislation is therefore of little aid to either side.[6]

A somewhat different situation is presented with respect to the lands patented entirely to the Regional Corporation under the ANCSA. Nearly half of the lands patented under the Act go entirely to Regional Corporation with no duality of ownership. The basis of the holding with respect to sand and gravel on the dually owned land was that destruction of the surface estate would result if sand and gravel were part of the subsurface estate. This consideration is clearly inapplicable to the lands owned wholly by one entity. As to these lands the Court must look to other considerations in the ANCSA.

 Section 7(i) of the Act was intended to achieve a rough equality in assets among all the Natives. That section requires that seventy percent of revenues received by the Regional Corporation from timber resources and the subsurface estate is to be shared among the other eleven Regional Corporations. This insures that all of the Natives will benefit in roughly equal proportions from these assets.

Sand and gravel are becoming increasingly valuable in Alaska due to rapid development and their use in construction. Yet, if sand and gravel are considered part of the surface estate the Regional Corporations having sand and gravel on lands which they own totally will not have to share the revenues received from this resource. This will cause great inequity as sand and gravel is only a valuable resource if it is located near one of the developing centers. The cost of transportation makes it unprofitable to ship this resource over great distances. It is precisely this unequal distribution of resources that section 7(i) is intended to counter. As the rationale for placing sand and gravel with the surface estate is dually owned lands under the Act does not apply to the lands wholly owned by the Regional Corporation, and as other countervailing considerations apply on these lands, sand and gravel will be considered as part of the subsurface estate on these lands.

While this holding may appear somewhat anomalous at first glance it is supported by the legislative history of the Act. As previously stated H.R. 7039 was adopted in substantial part into H.R. 10367. H.R. 10367 was adopted in substantial part into the final version of the Act. Prior to the change which created the surface/subsurface distinction H.R. 7039 was structured such that sand and gravel on the dually owned land would have gone to the Village Corporation. See pp. 864–865, supra. However, in that bill the predecessor to the present Section 7(i) provided revenue sharing for ". . . the sale, lease . . . or other disposition of lands or interests in lands, *including surface resources,* and minerals to which it acquires a patent . . ." H.R. 7039, Sec. 9(g)(2), House Committee Report p. 29.

Thus, this bill provided for precisely the same scheme regarding sand and gravel

<hr>

6. The United States has raised additional arguments in an Amicus brief. It contends that granting sand and gravel to the surface owner in areas within Wildlife Refuges would be destructive of those regions. This position is without merit. See 22(g), 43 U.S.C. § 1621(g) which requires that such lands be governed by specific regulations to protect the Wildlife Refuge. The United States further maintains that Section 102 of P.L. 94–258, April 5, 1976, specifically includes sand and gravel in the subsurface estate. The Senate Conference report, however, clearly states that it only is so included for the purposes of that legislation.

The contention that this holding will create difficulty with respect to the Stock Raising Homestead Act of 1916, 43 U.S.C. §§ 291–301, is not compelling. The basis of this holding is the peculiar facts and circumstances surrounding the ANCSA. The facts, circumstances and considerations of other Acts may mandate a different result in those cases but do not affect this case.

that the Court's holding creates. It is true that the language was subsequently changed to surface estate and the subsurface estate. However, this bill is only cited to support the proposition that the Congress may have at one time envisioned such a scheme, not as controlling authority for it. The authority for such a result is found in the policies previously stated.

*Gross or Net*

■ The second issue before the Court is whether the use of the term "all revenues" in Section 7(i) refers to gross of net revenues. Section 7(i) requires the seventy per centum of all revenues from timber resources and the subsurface estate are distributed from the Regional Corporation owning such resources to the other eleven Regional Corporations. If the term "all revenues" means gross revenues then the resource owning region would have to distribute seventy percent of its gross revenues and from the thirty percent it retained it would have to deduct expenses. If the term means "net revenues", in effect all the corporations would receive revenues and have to help defray expenses in proportion.

Fortunately the Court has the benefit of another ruling on the issue. See *Doyon Limited, et al. v. NANA Regional Corporation*, Civ. No. 1531–74 (D.D.C.1976). In the *Doyon* case Judge Gasch determined that "all revenues" encompassed a limited net approach. This Court accepts much of the reasoning of Judge Gasch on this issue and for the sake of brevity it will not be repeated here.[7] See *Doyon*, supra at 6–11. In addition there are other factors not considered by that Court which support the net approach.

The District of Columbia Court found that the legislative history on this point was not persuasive. This Court, however, finds substantial support for the net position in the legislative history. The House bill that was eventually passed spoke only in terms of "revenues." H.R. 10367, 92d Cong., 1st Sess., § 6(g) (1971). However, that section required one hundred percent revenue sharing. The House was apparently attempting to create total equality among all the Regional Corporations. It seems extremely unlikely, therefore, that the House intended to require the resource owning Corporation to absorb all of its expenses as this would have created great inequality. This version, therefore, obviously referred to a net concept. The Senate version of the Act which contained a 50%–50% revenue sharing plan specifically referred to "net revenues." S. 35, 92nd Cong., 1st Sess., § 9(j)(1) (1971).

When these two bills went into conference, the major focus was on the percentage split and the final Act eventually contained the 70%–30% ratio. It is true that the final version used a somewhat ambiguous term but as both bills comprising the Act referred to a net concept it is difficult to find that the Committee members had anything else in mind in structuring the compromise version. If they had it surely would have been appropriate to mention this major change or make their intentions more clear.

In addition, one of the major statutory bases for those advocating a gross position is the language in the statement of policy that this settlement was to be accomplished "without litigation." 43 U.S.C. § 1601(b). Research has not indicated precisely what litigation this phrase refers to but there is substantial support for the position that it does not apply to the present case.

In enacting the ANCSA Congress was acutely aware of the fact that there were many legal claims pending which involved the Natives aboriginal rights. "The alternative to a prompt legislative disposition of the Alaska Native claims is a myriad of

---

7. In this case at the present time, as with the *Doyon* case, the Court needs only to decide this issue as it relates to passive landowners. This concept as presently developed refers to those landowners who are not participants in the extraction, transportation and manufacture of the resources. Any reference to development costs in this opinion or in the District of Columbia case is deemed to refer to costs of land selection, contract negotiation, etc., that are a prerequisite to the sale or lease of these resources to an active developer.

lawsuits. . . . " Alaska Native Claims Settlement Act of 1970, Senate Report No. 91–925, June 11, 1970, p. 56. It may well be that the reference to avoidance of litigation refers to litigation between the Natives and the State of Alaska and Federal Government over Native Rights to land. This reference probably has no connection to the present situation in which the Native corporations are suing each other under the Act.

Certainly adoption of a net position will increase the litigation and complicate the proceedings in this case and those that may follow on the disbursement of 7(i) funds.[8] However, it is clear that the purposes and history of the Act dictate such a result.

At the urging of counsel this Court refrains from taking the step taken by the *Doyon* Court of delineating any guidelines as to what deductions may be taken to arrive at the final net figure. Until there is more evidence available it is not possible for the Court to decide precisely what categories of deduction will be properly allowed.

The Court does require, however, that counsel should begin immediately through conference and stipulation to set up some type of arbitration procedure through which disputed claims for deductions can pass. At the next Court date in this case presently set for December 10, 1976, counsel should be prepared to report to the Court on what procedures have been agreed upon for negotiating these disputes.

Accordingly, IT IS ORDERED:

THAT the motions for partial summary judgment are granted and denied in conformity herewith.

---

**8.** This Court takes little comfort in the assertion by counsel that a net concept will be no more difficult to administer than the Internal Revenue Code.