BAY VIEW, INC., Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 00–5097.

United States Court of Appeals,
Federal Circuit.

DECIDED: Dec. 3, 2001.

Samuel J. Fortier, Fortier & Mikko, P.C., of Anchorage, Alaska, argued for plaintiff-appellant.

Sandra Slack Glover, Attorney, Environment and Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were Lois J. Schiffer, Assistant Attorney General; Susan L. Pacholski, and David C. Shilton, Attorneys.

Before NEWMAN, LOURIE, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge RADER. Dissenting opinion filed by Circuit Judge PAULINE NEWMAN.

RADER, Circuit Judge.

Bay View Inc. appeals the decision of the United States Court of Federal Claims dismissing its complaint. Bay View had complained that the 1995 amendment of

the Alaska Native Claims Settlement Act (ANCSA) was a taking, a breach of trust, and a breach of contract. *Bay View, Inc. v. United States,* 46 Fed.Cl. 494 (2000). The Court of Federal Claims dismissed the taking and breach of contract claims for failure to state a claim, and dismissed the breach of trust claim for lack of jurisdiction. *Id.* Because Bay View had no vested property interest in the Regional Corporations' revenue from sales of net operating loss deductions and the ANCSA created neither a trust nor a contractual relationship between the United States and the Alaska natives, this court affirms.

## BACKGROUND

■ The Alaska Native Claims Settlement Act, Pub.L. No. 92–203, 85 Stat. 688 (Dec. 18, 1971), *codified at* 43 U.S.C. §§ 1601–1629 (1994 & Supp. III 1997), extinguished all claims of aboriginal title in Alaska. ANCSA divided Alaska into twelve geographic regions and established a native-owned Regional Corporation for each. ANCSA also established about 220 Village Corporations, one for each native village entitled to receive land and funds under ANCSA. Then ANCSA gave the Village Corporations the surface estates of about 22 million acres of land. ANCSA gave the Regional Corporations 16 million acres of land in fee as well as the subsurface estates and timber rights for the 22 million acres of the Village Corporations. Bay View is a Village Corporation.

43 U.S.C. § 1606(i) required each Regional Corporation to share with the other Regional Corporations "all revenues received by each Regional Corporation from the timber resources and subsurface estate patented to it pursuant to this Act." Section 1606(j) required each Regional Corporation to share with the Village Corporations in the region a percentage (45% for the first five years and 50% thereafter) of

its income from certain sources, including revenues received under § 1606(i).

The tax basis for the land or interests in land, such as timber, was set at the "fair value of such land or interest in land at the time of receipt." 43 U.S.C. § 1620(c) (1994 & Supp. III 1997). Accordingly, the tax basis for the native corporations' (Regional and Village Corporations') assets were set in the early 1970's when they received the assets. The 1984 Deficit Reduction Act (DEFRA) exempted the native corporations from DEFRA's ban on sales of net operating loss (NOL) deductions. When native corporations sold their natural resources in the 1980's, they often incurred operating losses because the value of those resources had decreased between the early 1970's and the 1980's. The native corporations sold these NOLs to profitable private corporations. The private corporations typically paid the native corporations about $30 for a $100 loss. These sales continued until 1988, when the law changed to forbid further NOL sales by native corporations. See *Technical and Miscellaneous Revenue Act of 1988,* Pub.L. 100–647, § 5021, 102 Stat. 3342, 3666 (1988).

None of the Regional Corporations included the revenues received from NOL sales in revenue sharing distributions. In 1995, Bay View filed a class action suit in the District of Alaska seeking to compel the Regional Corporations to share the NOL proceeds. The district court dismissed the action, holding that the Village Corporations could not enforce the ANCSA provision against the Regional Corporations. *Bay View, Inc. v. Ahtna, Inc.,* Civ. No. 94–551 (D.Alaska, July 7, 1995). While Bay View's appeal to the United States Court of Appeals for the Ninth Circuit was pending in 1995, Congress amended § 1606. This new section (i)(2) expressly states that "revenues" under

§ 1606 do not include benefits received from "losses incurred" by a Regional Corporation. In other words, the new § 1606(i)(2) clarified that the Regional Corporations do not have to share NOL proceeds. The Ninth Circuit affirmed based on the 1995 amendment, noting that the new § 1606(i)(2) was fully retroactive. *Bay View, Inc. v. AHTNA, Inc.,* 105 F.3d 1281, 1284 (9th Cir.1997).

Bay View then filed an action against the United States in the Court of Federal Claims alleging that the 1995 amendment was a taking, a breach of trust, and a breach of contract. Bay View argued that the 1995 amendment to section 1606(i) of ANCSA was a compensable taking under the Fifth Amendment. Specifically, Bay View contended that it had compensable vested rights in the Regional Corporations' revenue from the NOL sales under the provisions of ANCSA. Bay View considers NOL revenue a shareable asset arising from natural resources under ANCSA.

The Court of Federal Claims held that the amendment was not a taking because the revenues received from NOL sales were not revenues "from the timber resources and subsurface estate." It further held that ANCSA did not create a trust relationship mandating a payment of money for breach of trust. Finally, the Court of Federal Claims held that ANCSA was not a contract or a treaty. Even if ANCSA was a contract or treaty, the trial court reasoned, the United States committed no breach because the Regional Corporations had never had an obligation to share NOL revenues. Accordingly, the Court of Federal Claims dismissed the taking and breach of contract claims for failure to state a claim and dismissed the breach of trust claim for lack of jurisdiction. Bay View timely appealed to this court, which has exclusive appellate jurisdiction. 28 U.S.C. § 1295(a)(3) (1994).

## DISCUSSION

■ This court reviews a dismissal for failure to state a claim without deference. *Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States,* 48 F.3d 1166, 1170 (Fed.Cir.1995). A plaintiff fails to state a claim upon which relief could be granted if the plaintiff cannot assert a set of facts that would support its claim. *Id.* In reviewing the Court of Federal Claims' grant of such a motion, this court assumes that all well-pled factual allegations are true and resolves all reasonable inferences in favor of the nonmovant. *Id.* This court also reviews without deference the Court of Federal Claims grant of a motion to dismiss for lack of jurisdiction. *JCM, Ltd. v. United States,* 210 F.3d 1357, 1359 (Fed. Cir.2000). "Whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings." *Bass Enter. Prod. Co. v. United States,* 133 F.3d 893, 895 (Fed.Cir. 1998). "In the absence of factual disputes, the question of contract formation is a question of law, reviewable *de novo.*" *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997).

## I.

■ In a takings analysis, a court first determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possesses a "stick in the bundle of rights." If a plaintiff possesses a compensable property right, a court proceeds to determine whether the governmental action at issue constitutes a taking of that "stick." *Karuk Tribe of Cal. v. Ammon,* 209 F.3d 1366, 1374 (Fed.Cir.2000) (citing *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.1995)).

■ Under ANCSA, a Regional Corporation must share revenue "received ...

*from* the timber resources and subsurface estate patented to it pursuant to this act." 43 U.S.C. § 1606(i)(1994 & Supp. III 1997)(emphasis added). Thus, Bay View's entitlement to compensatory property in this case depends on whether the money received by Regional Corporations from NOL sales was "from" the underlying timber resources within the meaning of the statute.

In a distant sense, the NOL proceeds have some connection to the timber resources. Specifically, the sale of the resources generated NOLs; the subsequent sale of NOLs produced these proceeds. The sale of the NOLs themselves, however, is a separate business transaction without any direct relationship to the tangible resources patented to the Regional Corporations. The Regional Corporation realized revenue from sale of NOLs because they found buyers and successfully negotiated sales of these intangible financial interests. The NOLs only existed in the first place because the Regional Corporations enjoyed a favorable tax status. Accurately characterized, the NOL proceeds are a product of the tax status of the Regional Corporations, not the product of timber resources. Thus, applying the terms of ANCSA, the NOL sales generated revenues from sales of financial interests related to tax status, not from tangible timber or mineral estates.

Stated in other words, private corporations that purchased NOLs from the Regional Corporations did not acquire any interest in timber or subsurface estates. Rather, these private corporations paid for the right to consolidate their tax returns with the Regional Corporations to reduce their own tax liability. Thus, the Court of Federal Claims determined correctly that NOL proceeds do not constitute "revenues . . . from the timber resources and subsurface estate."

· ▮▮▮ Some forms of legislative history supply insights into the meaning of enactments. While statements of a single legislator rarely reflect the will of the entire Congress, a joint statement of a conference committee more often reflects the joint will of each house of Congress. In this case, the Joint Statement of the Committee of Conference for ANCSA discusses the sharing of revenues between the Regional Corporations and the Village Corporations: "This provision does not apply to revenues received by the Regional Corporations from their investment in *business* activities." Conf. Rep. No. 92–746, 92nd Cong. 1st Sess. (1971), 1971 U.S.C.C.A.N. 2247, 2249 (emphasis added). This language suggests that the preposition "from" in § 1606(i) does not embrace financial and business revenues beyond those received directly from natural resources.

This statement in the Joint Statement refers to § 1606(j), not § 1606(i). However, § 1606(j) expressly applies to income received "under subsection (i) (revenues *from* the timber resources and subsurface estate patented to it pursuant to this Act)." (Emphasis added.) In this case, the NOL generated revenue for the Regional Corporations based on business dealings with profitable corporations, not directly from the sale of natural resources. Thus, the NOL revenue is not "from" the timber resources and subsurface estates within the meaning of § 1606(i)-(j). Consequently, ANCSA does not support an expansive meaning of "all revenues from" to comprehend "all economic benefit derived" from the natural resources.

In sum, Bay View does not possess a compensable property right in the Regional Corporations' revenue from the NOL sales. Thus, this court need not assess whether the United States took that interest in the 1995 amendment. Accordingly, the 1995 amendment to section 1606(i),

exempting NOL revenues from the Act's sharing requirement, did not take private property from Bay View for a public purpose.

## II.

In *United States v. Mitchell,* 463 U.S. 206, 226, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), the Supreme Court held that a plaintiff claiming a breach of fiduciary duty must identify a statute that creates a trust relationship and mandates the payment of money for damages stemming from the breach of that trust relationship. Where statutes "clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Id.* Moreover, if the Government "takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *Id.* at 225, 103 S.Ct. 2961.

In considering a claim that the United States breached fiduciary duties by violating the land selection rights under ANCSA, this court has previously stated:

> The text and legislative history of the ANCSA make clear that Congress sought to avoid creating any fiduciary relationship between the United States and any Native organization. *See 43 U.S.C. 1601* (b); S.Rep. No. 92–405, at 108 (1971). Moreover, there is no provision of the ANCSA that mandates the payment of money for failure to carry out the provisions of the statute. Accordingly, we agree with the Court of

Federal Claims that it lacked jurisdiction over Seldovia's breach of fiduciary duty claims.

*Seldovia Native Ass'n v. United States,* 144 F.3d 769, 784 (Fed.Cir.1998).

In reaching its decision to dismiss Bay View's complaint for lack of subject matter jurisdiction, the Court of Federal Claims found that Bay View's breach of trust claim did not satisfy the requirements set out by *Mitchell. Bay View,* 46 Fed.Cl. at 498. Indeed the trial court correctly determined that no trust relationship arose between the United States and the Alaska natives because the United States restricted alienation of stock ownership in the native corporations. The actions of the United States did not assert control or supervision over tribal money or property. The United States did not receive, hold, or disburse any revenues received by the native corporations. Thus, the United States has not acted in the capacity of a trustee for the native corporations' revenues or breached any fiduciary duties. Accordingly, as this court previously held in *Seldovia,* ANCSA did not create a trust relationship between the United States and the Alaska natives or any substantive right enforceable against the United States for money damages.

## III.

"Any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997). "An implied-in-fact agreement must be founded upon a meeting of the minds, which, although not embodied in an ex-

# 1266

press contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Id.*

 In this case, the only alleged contract is ANCSA itself. Because ANCSA does not purport to create an express contract between the United States and Bay View, the record of ANCSA's enactment would have to support an implied contract. Although it extinguished aboriginal title to land and, at the same time, gave the United States some rights to share in resource exploitation, ANCSA does not meet the requirements for a contract. For instance, ANCSA evinces no offer from the Alaska natives accepted by United States with ample consideration to show a contractual agreement. The Alaska natives participated in the legislative process leading up to ANCSA, but nothing in the Act or its enactment history suggests that they made a specific offer to the United States. Nor does the Act or the record show that the United States made a specific defined offer to the natives. Neither alleged contractual party accepted these nonexistent offers. Rather ANCSA, while seeking to "settle" aboriginal claims, was a unilateral act by the United States. Accordingly, ANCSA is not a contract between the United States and the Alaska natives (or native corporations such as Bay View).

## CONCLUSION

The Court of Federal Claims correctly determined that Bay View had no vested property interest in the Regional Corporations' revenue from the NOL sales and that the ANCSA created neither a trust nor contractual relationship between the United States and the Alaska natives. Therefore, the trial court did not err in dismissing Bay View's complaint.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

By legislation enacted in 1995, the United States removed from the Alaskan Native Villages their entitlement to share with the Regional Corporations in the full value received for sale of Alaskan Native timber resources. The legislation removed from this statutory sharing obligation the revenues generated by sale of the timber below its initial cost valuation. This targeted legislative removal from the Native Villages of their existing entitlement to share in the revenues already received, attributable to and directly related to the timber resources in transactions long completed, raises a straightforward issue cognizable under the Fifth Amendment. I must, respectfully, dissent from my colleagues' ruling that Bay View did not state a claim on which relief can be granted.

Until 1995, the Alaska Native Claims Settlement Act of 1971 (ANCSA) required sharing of "all revenues received" from the timber and mineral resources of the Native Alaskan lands. ANCSA § 7(i), codified at 43 U.S.C. § 1606(i). As explained in *Aleut Corp. v. Arctic Slope Regional Corp.*, 484 F.Supp. 482, 485 (D.Alaska 1980), "revenues received by a regional corporation that are attributable to, directly related to, or generated by the acquisition of an interest in the corporation's subsurface estate are revenues subject to the sharing provisions of section 7(i)." Many years later, the 1995 Amendment amended Section 7(i) as follows:

(A) Section 7(i)(2)-for purposes of this subsection, the term "revenue" does not include any benefit received or realized for the use of losses incurred or credits earned by the Regional Corporation.

(B) This amendment shall be effective as of the date of the enactment of the Alaska Native Claims Settlement Act ... [1971].

We are not concerned here with the effect of the 1995 Amendment on prospective rights of either the Regional Corporations or the Native Villages. However, its explicit retroactivity had a significant effect on rights already accrued and vested, for the sales here at issue were all completed between 1984 and 1988. These were the sales that were targeted by the 1995 enactment.

## DISCUSSION

The ANCSA of 1971 is "a comprehensive statute designed to settle all land claims by Alaska Natives." *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 523, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998). Although its implementation has not been free of dispute, a foundation principle was that the economic benefits of Native natural resources would be shared equitably among Alaska Natives whose lands were resource-poor as well as those that were rich. *See* 43 U.S.C. § 1602(i); *Chugach Natives, Inc. v. Doyon, Ltd.*, 588 F.2d 723, 732 (9th Cir.1978) ("We agree with the district court that the revenue sharing provision in § 7(i) 'was intended to achieve a rough equality in assets among all the Natives.... [The section] insures that all of the Natives will benefit in roughly equal proportions from these assets.'") (quoting *Aleut Corp. v. Arctic Slope Regional Corp.*, 421 F.Supp. 862, 867 (D.Alaska 1976)).

The Deficit Reduction Act of 1984, terminated in 1988, was specifically designed to permit the Alaska Natives to add value to their timber resources in order to enlarge the economic benefits available from their natural resources. Sale of the tax losses of a timber sale is directly related to the timber sale. Indeed, the record shows that the native timber sales strategy was dominated by this purpose, producing what Bay View calls "fire sales" in 1988 in order to take advantage of this increased value of the timber. As Bay View explains, the sale of the timber and of the losses of the timber sale were not two entirely different transactions but a single continuing transaction, each causing the occurrence of the other.

Section 1606(i) of 43 U.S.C., as enacted and as it existed until 1995, required that a percentage of "all revenues ... from the timber resources and subsurface estate" be shared among the regional corporations and with the village corporations. The 1995 Amendment authorized the Regional Corporations to exclude from this obligation the revenues received from sale of the tax losses generated by the timber sales. The Regional Corporations' reluctance to share these revenues entailed sales of timber losses of over $1.5 billion, with a sharing value to the villages of about $425,000,000.

For these sales, already completed and proceeds already realized, the villages' right to their statutory share was fully vested. Legislation that retroactively affects vested rights is "not favored in the law." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). It violates fundamental concepts of justice and fairness, to change the rules after the game is played. In *Eastern Enterprises v. Apfel*, 524 U.S. 498, 529, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) the Court struck down a statute that "imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *See also, e.g., United States v. Security Industrial Bank*, 459 U.S. 70, 73–74, 103 S.Ct.

407, 74 L.Ed.2d 235 (1982) (a bankruptcy avoidance statute is not subject to retroactive application). In this case, with specific retroactive effect on previously vested rights, the consequences thereof are not immune from the Fifth Amendment.

The government stresses that Alaska's Senator Stevens told Congress that the 1995 Amendment was simply a clarification, not a change of law. Bay View points out that there were no hearings, and that it is not reasonable to believe that in 1971 the Native Villages would have readily yielded their right to share in $1.5 billion in revenue from their timber resources. Nor does it appear even remotely likely that the villages would have agreed in 1971 to the hasty sale of these resources at a severe loss during the 1984–1988 window of the Deficit Reduction Act, unless they would share in the revenues of those sales. *Cf. Peabody Coal Co. v. Navajo Nation,* 75 F.3d 457, 467 (9th Cir.1996) (the requirement that mineral sale "proceeds" be shared between Navajo and Hopi tribes included proceeds of a tax levied by the Navajo on their sale of minerals).

I take note of the government's argument that there were in fact some distributions of tax-loss proceeds among the Native Villages, thus reducing the magnitude of the asserted taking. This aspect relates to quantum, not entitlement, and was not reached by the Court of Federal Claims. Nor do I endorse the court's casual disposition of the trust relationship between the United States and the Alaska Natives, for the ANCSA did not eliminate all fiduciary responsibility of the United States. Before enactment of the 1995 Amendment the Alaskan Native entities were litigating this issue among themselves. The Ninth Circuit, before whom the case was pending at the time of the 1995 Amendment, recognized that any remedy must now come from the Tucker Act, stating in *Bay View,*

*Inc. v. Ahtna, Inc.,* 105 F.3d 1281, 1286 (9th Cir.1997) that "We express no view as to whether appellants had a property right that was destroyed by Congress; that is a question that will have to be answered by the Court of Federal Claims, if appellants choose to bring suit there."

Statute and precedent make quite clear that Bay View had a property right in the full proceeds of the timber sales. The retroactive legislation which deprived Bay View of its share raised a claim cognizable under the Fifth Amendment. From this court's affirmation of the dismissal of that claim, I respectfully dissent.