ON COMBINED PETITION FOR PANEL REHEARING AND REHEARING EN BANC
 

 ORDER
 

 A
 
 combined petition for panel rehearing and rehearing en banc having been filed by the Appellant, and a response thereto having been invited by the court and filed by the Appellee, and the petition for rehearing having been referred to the panel that heard the appeal, and thereafter the petition for rehearing en banc and response having been referred to the circuit judges who are in regular active service, and authorized to request a poll whether to rehear the appeal en banc,
 

 A poll having been requested, taken, and failed,
 

 Upon consideration thereof,
 

 IT IS ORDERED THAT:
 

 (1) The petition for rehearing is denied.
 

 (2) The petition for rehearing en banc is denied.
 

 (3) The mandate of the court will issue on April 1, 2002.
 

 Circuit Judge GAJARSA,
 

 with whom Circuit Judge NEWMAN, Circuit Judge CLEVENGER, and Circuit LINN join, dissents from the denial of the petition for rehearing en banc.
 

 GAJARSA, Circuit Judge, with whom NEWMAN, CLEVENGER, and LINN, Circuit Judges, join, dissenting from the denial of the petition for rehearing en banc.
 

 In
 
 Bay View, Inc. v. United States,
 
 278 F.3d 1259 (Fed.Cir.2001)
 
 (“Bay View”),
 
 a divided panel of this court affirmed the decision of the Court of Federal Claims dismissing Bay View’s complaint for failure to state a claim upon which relief may be granted. The panel majority determined that Bay View had no vested property interest on which to predicate its taking claim.
 
 Id.
 
 at 1262. Judge Newman dissented.
 
 Id.
 
 at 1266-68. Because Judge Newman was correct that Bay View had a vested property interest and that its complaint therefore raised “a straightforward issue cognizable under the Fifth Amendment,”
 
 id.
 
 at 1266, and because of the gravity of the error associated with the panel majority’s conclusion to the contrary, this court should have granted the petition for rehearing
 
 en banc.
 
 The failure to do so compounds the error committed by the majority. For the reasons stated below, we must respectfully dissent from this court’s failure to grant the petition.
 

 Bay View’s complaint alleged that a 1995 amendment to the Alaska Native Claims Settlement Act (“ANCSA”), among other things, effected a taking under the Fifth Amendment. Congress enacted the ANC-SA in 1971 to eradicate the cloud on title to land ownership in Alaska posed by claims of aboriginal title.
 
 See
 
 H.R. Rep. 92-523,
 
 reprinted in,
 
 1971 U.S.C.C.A.N. 2192, 2193 (stating that the purpose “is to provide an equitable solution to the claims made by the Natives of Alaska through a combination grant of land and money”). To this end, the ANCSA extinguished all claims of aboriginal title in Alaska in exchange for granting ownership of certain interests in land to twelve native-owned Regional Corporations
 
 [1]
 
 and to approxi
 
 *1037
 
 mately 220 smaller, native-owned Village Corporations.
 
 Bay View,
 
 278 F.3d at 1262;
 
 see also
 
 H.R. Rep. 92-532,
 
 reprinted in,
 
 1971 U.S.C.C.A.N. 2192, 2194 (stating that judicial settlement of claims to aboriginal title would “take many years, would involve great administrative expense, and would involve a Federal liability of an un-determinable amount,” that therefore a legislative settlement “is the only practical course to follow,” and that enactment of the ANCSA “would provide this legislative settlement”).
 

 The ANCSA gave the Village Corporations surface estates in approximately 22 million acres of land, and gave the Regional Corporations 16 million acres of land in fee as well as the subsurface estates and timber rights for the 22 million acres in which the Village Corporations received surface rights.
 
 Bay View,
 
 278 F.3d at 1262. Bay View is one of these Village Corporations.
 
 Id.
 
 Although the ANCSA gave the Regional Corporations the timber rights in those 22 million acres, it also required the Regional Corporations to share with each other a percent of “all revenues received by each Regional Corporation
 
 from the timber resources
 
 and subsurface estate patented to it pursuant to this chapter,” 43 U.S.C. § 1606(i). Section 1606(j) then required each Regional Corporation to share with the Village Corporations in its region a percentage of its income from certain sources, including revenues received under § 1606(i).
 
 Bay View,
 
 278 F.3d at 1262;
 
 see also Bay View, Inc. v. Ahtna, Inc.,
 
 105 F.3d 1281, 1283 (9th Cir.1997) (“[E]ach Regional Corporation must distribute 50% of the ‘shared revenue’ to its assigned Village Corporations and at-large shareholders.”) (citing § 1606(j))
 
 (“Ahtna”);
 
 H.R. Rep. 92-523,
 
 reprinted in
 
 1971 U.S.C.C.A.N. 2192, 2198-99 (stating that the bill intends “to avoid the creation of one or more giant corporate entities ... that might become in effect the third level of government” in Alaska, and that “[although twelve regional corporations are contemplated,
 
 a substantial portion of the funds received by them must be passed on to the village level”)
 
 (emphasis added).
 
 [2]
 

 In order to provide a value from which the “shared revenue” could be determined, Congress set the tax basis for the land at its estimated fair value at the time of receipt, and set the basis for land interests attributable to an interest in a block of timber at its fair value at the time of first commercial development.
 
 See
 
 43 U.S.C. § 1620(c) (1994 & Supp. Ill 1997). This value was set in the early 1970’s. Due to various economic factors, when much of the timber was sold in the 1980’s, the Regional Corporations incurred losses. These losses represented the difference between the fair value of the timber rights and the value the Regional Corporations realized when the timber was sold.
 
 [3]
 
 These
 
 *1038
 
 losses were reported as accounting losses realized directly from the timber sales, permitting many of the Regional Corporations to report net operating losses (“NOLs”) for tax purposes.
 

 These accounting losses were particularly valuable assets, because, between 1984 and 1988, Alaskan Native Corporations were specifically exempt by statute from the normal Internal Revenue Service restrictions on the sale of net operating losses. Thus, by a specific act of Congress intended to benefit the Alaskan natives, the Regional Corporations were able to sell the net operating losses to profitable companies including Campbell Soup and the Marriott Corporation, thereby converting these accounting losses obtained from the timber sales to a net gain.
 
 Cf. Ahtna,
 
 105 F.3d at 1284 (calling this device “a discreet way to give the Alaskan natives a subsidy without having to list it as a budget item” (citing 132 Cong. Rec. S8175-76 (daily ed. June 23,1986) (statement of Sen. Stevens))). The Regional Corporations typically received about $30 for a $100 loss, and, in the end, sold approximately $1.5 billion in losses, converting them into millions of dollars of profitable revenue.
 

 The Village Corporations sought to obtain their revenue share from the sale of the NOLs, but the Regional Corporations refused. As the Ninth Circuit explained:
 

 Although section 7(i) of ANCSA requires sharing of resource-based revenue among the Regional Corporations, 43 U.S.C. § 1606®, ten of the Regional Corporations agreed not to share NOL revenue as part of a Mutual Assistance Agreement (MAA). This cut out village corporations and at-large shareholders whose Regional Corporations were unable to get in on the bounty.
 

 Ahtna,
 
 105 F.3d at 1284 (footnote omitted, noting that the Regional Corporations contended that NOL revenues were not sharable under section 7® because they were from tax law not timber).
 

 Bay View filed a class action on behalf of the Village Corporations, which the United States District Court for the District of Alaska dismissed.
 
 Id.
 
 On appeal, the Ninth Circuit affirmed the dismissal on the grounds that an intervening amendment to the ANCSA “wiped out any claim appellants might have had to shared NOL revenue.”
 
 Id.
 
 (citing" Pub. L. No. 104-42, § 109, 109 Stat. 353, 357 (1995) (codified at 43 U.S.C. § 1606(i)(2)) (“For purposes of this subsection, the term ‘revenues’ does not include any benefit received or realized for the use of losses incurred or credits earned by a Regional Corporation.”)). Congress made this amendment fully retroactive, thereby taking away from the Village Corporations, by unilateral Congressional action, their right to share in this revenue.
 
 Id.
 
 The Ninth Circuit also held that it lacked jurisdiction to address the merits of Bay View’s taking claim because the appellants were entitled to bring that claim before the Court of Federal Claims, pursuant to the Tucker Act.
 
 Id.
 
 at 1285.
 

 Bay View then brought this suit in the Court of Federal Claims. Bay View complained that the 1995 amendment changed the law and took away a vested property right, and that it was therefore entitled to just compensation pursuant to the Fifth Amendment. The panel majority affirmed the Court of Federal Claims’ determination that Bay View failed to state a claim because the Village Corporations never had a property interest in a portion of the proceeds from the sale of NOLs generated by the timber sales.
 
 Bay View,
 
 278 F.3d at 1266. It so concluded because it held
 
 *1039
 
 that the Village Corporations had a right only to revenue
 
 “from
 
 the timber resources” under §§ 1606(i) and (j).
 
 Id.
 
 at 1263-64. Proceeds from the sale of NOLs, it held, were a separate business transaction; they were not from the sale of timber resources within the meaning of the statute because they were “not
 
 directly
 
 from the sale of natural resources.”
 
 Id.
 
 at 1264 (emphasis added).
 

 This conclusion fails to comprehend that the NOLs are in fact revenues derived from the timber sales. This failure is grave error. The net operating losses represented the negative asset value of the timber after it was sold at less than the tax basis established by Congress. It is true that Congress may not have intended to confer upon the Village Corporations a right to share in all other future business income; however, this was limited to revenue the Regional Corporations generated by investing the portion of residual timber sale proceeds they were entitled to keep (rather than required to share) in subsequent business transactions. In contrast, “[sjtatute and precedent make quite clear that Bay View had a property right in the
 
 full proceeds
 
 of the timber sales,”
 
 id.
 
 (Newman, J., dissenting) (emphasis added), in the first instance. Hypothetically, if the Regional Corporations had structured the timber sales such that they sold timber rights in exchange for stock in a corporation, and then sold that stock for cash in a subsequent transaction, surely the Regional Corporations could not escape their statutory obligation to share the timber sale proceeds by virtue of that “indirectness.” If the stock were subsequently sold at a loss, the result would be the same. Substituting “NOLs” for “stock,” that is precisely what happened in this ease. Either way, the intervening paper transaction fails in principle to sever the connection between the revenue received and the value of the timber.
 

 The sale of the net operating losses was not a subsequent business transaction that increased the value of timber proceeds above and beyond a portion that the Regional Corporations had already shared. It was the realization of revenue in exchange for the negative asset value of the timber. This accounting loss was the timber value that the Regional Corporations had yet to share. Had the Regional Corporations sold the timber for a
 
 profit,
 
 they would unquestionably have been obligated to share that profit, and, moreover, that profit would have been calculated based upon the Regional Corporations’ statutory tax basis in the timber. The tax basis is only a reference point determinative of the fair value of the timber transferred pursuant to the ANCSA. The tax basis caused the Regional Corporations to account for a tax loss in the sale of the timber rather than a profit, which tax loss is the operating loss gainfully sold by the Regional Corporations. This tax loss is an asset derived directly from the timber sale, which was monetized by its sale to profitable corporations. It was a property interest derived from the sale of timber that the Regional Corporations were required to share with the Village Corporations.
 

 That the sale of NOLs incurred from timber sales generated “revenue[ ] received ... from the timber resources,” 43 U.S.C. § 1606(j), prior to the 1995 amendment is underscored by the substance of the amendment itself. Notably, the new subsection created by that amendment in 1995, § 1606(i)(2), does not exclude NOL proceeds from the sharing requirement on the grounds that revenue generated from such proceeds fails to constitute revenue generated
 
 from,
 
 or directly from, the timber resources. Rather, the amended subsection excludes NOL proceeds from the definition of “revenue” entirely.
 
 See
 
 43 U.S.C. § 1606(i)(2) (Supp. V 1999) (“For purposes of this subsection, the term ‘reve-
 
 *1040
 
 núes’ does not include any benefit received or realized for the use of losses incurred or credits earned by a Regional Corporation.”). Prior to that amendment, no provision of the ANCSA specifically defined the term “revenue.” It must therefore have been construed according to its plain meaning,
 
 viz.
 
 the return, yield, or profit from an income source.
 
 See
 
 XIII
 
 The Oxford English Dictionary
 
 815-16 (2d ed. 1989) (defining revenue as,
 
 inter alia,
 
 “[t]hat which comes in to one as a return from property or possessions ... income from any source (but esp. when large and not directly earned)”). Prior to their specific exclusion from the definition, proceeds from the sale of NOLs fell within the plain meaning of the term “revenue.” Those NOLs incurred from timber sales, when sold, therefore generated revenue from the timber resources; there is simply no other resource from which they could be said to originate. This alteration to the definition of “revenue” cannot properly be deemed mere clarification of the law. It altered the plain meaning of “revenue,” and, in doing so, it eviscerated the sharing requirement previously applicable to the proceeds of the sale of NOLs incurred from the sale of timber.
 

 Prior to the 1995 amendment to the ANCSA, in exchange for extinguishing Native aboriginal title claims in Alaska, Congress gave Bay View a vested property right to a portion of the full fair value of the timber — to
 
 “all revenues
 
 received by each Regional Corporation
 
 from the timber resources.”
 
 43 U.S.C. § 1606© (1994) (emphasis added). Congress retroactively revoked that right. As a result, Bay View has a cognizable Fifth Amendment claim. That claim should have been heard on the merits, not dismissed on the pleadings. For these reasons, we respectfully dissent.
 

 [1]
 

 . Originally, the ANCSA established only twelve Regional Corporations. A thirteenth
 
 *1037
 
 Regional Corporation, however, was subsequently established to represent those Alaskan Natives living in the lower forty-eight States, see 43 U.S.C. § 1606(c).
 

 [2]
 

 . The sharing requirement is now 70 percent. See 43 U.S.C. § 1606(i)(l) (1994 & Supp. V 1999).
 

 [3]
 

 . The losses were derived artificially because of the tax basis established by Congress.
 
 Cf.
 
 132 Cong. Rec. 14943 (statement of Sen. Stevens, June 23, 1986) (explaining that for accounting purposes Native Corporations cannot carry on their books many of the assets received under the ANCSA “because it is virtually impossible to make a solid estimate of the value of these assets" under generally accepted accounting principles, but noting that Native Corporations “are entitled to recognize a cost basis for tax purposes" pursuant to the legislation). Had Congress set the tax basis at zero, for instance, there would have been no loss from the sale of the timber rights, and any and all proceeds would have
 
 *1038
 
 been profits from which the "shared revenue" would derive.